266 So.2d 825

**Michael HANNON**

**v.**

**STATE.**

**1 Div. 179.**

Court of Criminal Appeals of Alabama.

Sept. 12, 1972.

---

John L. Lawler, Mobile, for appellant.

William J. Baxley, Atty. Gen., and Sarah V. Maddox, Asst. Atty. Gen., for the State.

HARRIS, Judge.

Appellant was convicted in the Circuit Court of Mobile County for robbery and the jury fixed his punishment at ten years in the penitentiary. Before arraignment, it was ascertained that the defendant was without means to employ counsel, and the court appointed C. Wayne Loudermilch, Robert M. Harper and Charles R. Butler, Jr., all licensed attorneys of Mobile and members of the Public Defender's Office, to represent and defend him. Mr. Harper alone defended Hannon on the first trial that resulted in a mistrial because the jury failed to reach a verdict. On the second trial, giving rise to this appeal, Hannon was represented by Mr. John L. Lawler, who is also a member of the Public Defender's staff.

At the call of this case, Mr. Lawler made an oral motion to dismiss the charges against Hannon for the reason that Honorable Charles R. (Randy) Butler, Jr., the present District Attorney for Mobile County, was, prior to his election to that office, associated with the Public Defender's Office and, as above noted, was originally assigned with two other public defenders to represent appellant. He contended that to allow the prosecution to continue would amount to a denial of a fair and impartial trial and would constitute a breach of the attorney-client relationship all to the irretrievable detriment of the defendant. An alternative motion was made seeking a change of venue on the ground that appellant could not get a fair trial in Mobile County because his former attorney was now cast in the role of prosecutor even though another member of the District Attorney's staff would actually conduct the prosecution.

A full blown hearing was had and testimony taken. It developed that Mr. Butler did interview Hannon in jail and subsequently filed a motion in his behalf to produce certain items in connection with the case. This was prior to the first trial and Mr. Butler had no further contact or communications with Hannon. Out of an abundance of precaution and to scrupulously protect the rights of appellant and to allay any implications of impropriety, the trial judge sent for Mr. Butler to come to his courtroom and give testimony as to his relations with the defendant. Mr. Butler testified that he had no independent recollection about the case, but stated that Hannon's face was familiar and he felt certain that he had interviewed him at one time and this probably took place in the county jail. He requested permission to look at the court file to refresh his recollection and there found a motion bearing his signature. He also recognized the name of the victim of the robbery—Pearlie Rone. Other than this, he could not recall anything else about the case. He forthrightly testified that he had not discussed this case with his assistant in charge of the prosecution and further that he had not mentioned this case or any other case to the personnel of his office that came to or passed through the Public Defender's Office during the nearly two years that he was connected with that office. The record reflects the following:

"THE COURT: Mr. Butler, have you used the record that you formerly had ac-

cess to as the Public Defender in any way in prosecuting this case today that . . .

"A. No, sir, when I left the Defender Office, I did not bring any records of any files of that office, other than legal memorandum and so forth that I had prepared on research problems and so forth.

"THE COURT: Just legal matters, . .

"A. Right.

"THE COURT: . . . nothing more?

"A. No factual matters at all.

"THE COURT: Have you turned over any information whatsoever to the prosecutor that's been assigned to this case, that you've ascertained when you were in the Public Defender's Office?

"A. No, sir.

"THE COURT: Have you given any oral advice or any oral consultation to the assistant district attorney that's appointed for this case, to prosecute this case from information you received as a Public Defender?

"A. No, sir, Judge.

"THE COURT: And you did not assist Mr. Harper in defending the case?

"A. Judge, that—if somebody could tell me that they saw me sitting there in the courtroom, I couldn't deny it because I don't remember. But my recollection was that Mr. Harper told myself and the Public Defender, Mr. Loudermilch that he was surprised that there was a hung jury and in a sense I can remember from the defense standpoint, we considered it a victory.

     \*    \*    \*    \*    \*    \*

"THE COURT: And to your knowledge you've never turned over at any time any information you've ascertained from this Defendant when you were talking to him before and when you were employed by the Public Defender's Office?

"A. No, sir."

He further stated that he does not assign the cases to his assistants for trial as he had turned over to his chief assistant the administrative duty of assigning cases for prosecution. He did not know that Hannon's case was on trial until he came into the courtroom. He did recall discussing the mistrial with Mr. Harper, who was trying to figure why the jury could not reach a verdict. During cross-examination, Mr. Butler was asked if he recalled that the complaining witness called Captain Riddle two days after making an identification in a lineup and asked him did she get the right person. Mr. Butler's answer was:

"A. Right, I remember that specifically. I didn't know it was this case but that's what we're talking about on the mistrial. On cross-examination she testified, now I remember, that she had called Captain Riddle or someone two days later and said 'did I pick out the right person?' And it went to the jury and Mr. Harper told me that he felt that's the reason the jury didn't convict. Now I remember I did not try that case."

In further support of his motion, appellant contended that to permit this prosecution to continue would have a baneful influence on the witnesses against him. It would make it easy for them to testify as to the identity of Hannon—if they had the slightest doubt as to his identity, then that doubt has been completely dispelled by the fact that his former attorney is now in charge of the prosecution so there can be no question that the right man is on trial, for otherwise the charges would be dismissed.

In an attempt to buttress his motion, appellant called the alleged victim of this robbery, who was in the courtroom during the testimony of Mr. Butler, and asked her questions about a lineup.

"Q. And after that occurred, (robbery) you came down to the Police Station, didn't you, at the request of some officer?

"A. Yes, sir.

"Q. All right, and when you got down there you viewed some men in a lineup?

"A. The third time I came I did.

"Q. All right, well at that time did you pick out someone as someone who had robbed you?

"A. Yes, the boy right there (indicating the Defendant).

"Q. And did you tell them at that time that that was the boy?

"A. I did.

"Q. And then did you two days later call Captain Riddle and ask him had you gotten the right person?

"A. I don't remember anything about that.

"Q. You don't remember doing that?

"A. I sure don't.

"Q. You don't recall testifying to that in the previous trial?

"A. I remember somebody saying something about it, but I told them that I didn't remember saying that.

"Q. All right, well you recall Captain Riddle testifying that perhaps you said that, is that right?

"A. I don't remember telling him either.

"Q. Let me ask you this Mrs. Rone and I want you to think about it very carefully after I ask you, I'm not trying to trick you, I'm just trying to do my job, but having listened to this proceeding this morning and knowing that Mr. Butler is District Attorney in this county now and that he at one time was this man's lawyer and knowing that his office plans to prosecute this man and has no independent desire to dismiss the charges, with that information in mind, knowing that that's his position and he at one time was this man's lawyer, does it make it a little bit easier for you to say who it was?

"A. Well I know it is because I looked at him.

"Q. I didn't ask you that though. Could you answer my question?

"A. Would that make it any easier, but its been easy all the time because I knew.

"Q. That didn't help you in any way?

"A. It didn't help me a bit.

Appellant also called Captain Donald Riddle, the detective who Mrs. Rone is alleged to have called two days after she viewed the third lineup, and he testified that she did call and ask if she had picked out the right man.

On cross-examination of Captain Riddle, the following occurred:

"Q. . . . when she called you do you have any independent recollection what she said to you?

"A. Well she asked me if she had identified the right man.

"Q. And what did you say Captain Riddle?

"A. And I said 'well just a minute now, whom did you identify, are you certain you know who you identified?' She said 'Oh, yes'. She said 'I remember clearly, I identified the No. 3 man'.

"Q. Number 3 man?

"A. Number 3 man. I said 'you're certain of this' and she said 'Yes. I'm certain of it, I'm positive of it'.

* * * * * *

"MR. GRADDICK: All right, but she did state during the lineup, I think you just testified to, that that was the man who robbed her, Number 3.

"A. Yes, sir.

"Q. And she just happened to call back two days later and ask if that was the right man?

"A. Yes, sir.

"Q. And you asked her at that time did she know who she identified, 'Yes, No. 3', is that correct?

"A. I asked her if she was absolutely certain and made her recall of course by number and she come back yes, sir, she was positive it was the No. 3 man."

In denying the motion, the Court said:

"All right, the Court concludes that the Defendant's rights have not been violated by the fact that Mr. Randy Butler was formerly with the Public Defender's staff and that there has been nothing presented to the Court to indicate that he would not get a fair trial and particularly in light of the fact that apparently one of the attorneys with the Public Defender's Office who was appointed, was Mr. Robert Harper, who engaged in the trial of this case back in January of 1970 and that all the evidence that was presented at that time apparently was made a public record and would be available to this Defendant for review and so it would be the opinion of this Court at this time that the Defendant's rights have not been violated by the fact that the present District Attorney was a member of the Public Defender's staff at the time the Defendant was last tried. So I would deny your motion to dismiss, your motion for change of venue and your motion to dismiss on the grounds that there was an improper identification at the lineup. * * *"

■ This appears to be a case of first impression in this State so far as a motion of this kind is concerned. The relationship of attorney and client is one of the most sacred relationships known to the law and places upon the attorney a position likened to a fiduciary calling for the highest trust and confidence, so that in all his relations and dealings with his client, it is his duty to exercise the utmost honesty, good faith, fairness, integrity and fidelity, and *he may not at any time use against his former client knowledge or information acquired by virtue of the previous relationship*. This rule is universal and hoary with age.

■ To permit a District Attorney to prosecute his former client, or to divulge to one of his assistants, in charge of the prosecution, the confidential information imparted to him by the client, can never be sanctioned. It would constitute an act wholly at war with due process of law. The injury would not be limited to the defendant—there is injury to the entire system of justice, to the law as an institution, to the community at large, to the democratic ideal reflected in the processes of our court, and would destroy the last vestige of public confidence and respect in the administration of our criminal laws.

■ The record in this case clearly shows that the District Attorney did not divulge the confidential information he gained from Hannon while he was a member of the Public Defender's Office. He had not been elected District Attorney when the grand jury indicted Hannon and had no connection therewith. He inherited for prosecution all indictments returned by grand juries in Mobile County not disposed of while his predecessor was in office. The public interest demanded that the prosecution go forward. There has been no breach of the attorney-client relationship, the privilege against disclosure has been preserved, and professional ethics, painstakingly observed, and the constitutional guarantee of a fair and impartial trial was not infringed.

A district court of appeals of Florida in the case of Young v. State, 177 So.2d 345, had before it a similar matter. In a proceeding for post-conviction relief, appellant filed the following motion:

"Movant respectfully submits that his constitutional rights were infringed upon at his trial, in that the Assistant State Attorney who prosecuted him at jury trial, Allen Allweiss, had previously been a member of the Public Defender's Office, which office handled movant's defense at said Jury Trial. The said Allen Allweiss, while a member of the Public Defender's office had occasion to interview and interrogate this Movant for purposes of said Movant's defense. This Movant's rights were greatly prejudiced by having made statements in preparation for his defense to one who later prosecuted him for said offense."

. The report of the case shows the following:

"The state attorney filed a motion in reply, admitting that Allweiss formerly had been a member of the public defender's office and that he had been the prosecutor at the appellant's trial, but denying . that Allweiss had interviewed the appellant while a public defender.

"The trial court denied appellant's petition in an order stating that it affirmatively appeared that the defendant was entitled to no relief. It is from this order that appeal is taken, the appellant arguing that in light of Rule 1 requirements he is at least entitled to a hearing on his petition. We agree, because under Rule 1 the trial court must grant a hearing '[u]nless the motion and the files and records of the ease *conclusively* show that the prisoner is entitled to no relief.' (Emphasis added).

"In reaching our decision we have faced two issues: (1) whether the allegations would, if true, establish that the appellant had been denied due process of law, thus rendering the judgment void; and (2) whether the failure to appeal the conviction precludes this collateral attack on the judgment via Rule 1.

"[1] In regard to the due process issue, we find the general rule to be that when an attorney has had dealings with a defendant as a defense counsel and later becomes a prosecutor in the same case, a conviction thereby obtained must be reversed. E. g., State v. Leigh, 1955, 178 Kan. 549, 289 P.2d 774; State v. Burns, Mo.1959, 322 S.W.2d 736; and 52 A.L.R. 2d 1286. In State v. Leigh, supra, the defendant and his wife had several conversations with an attorney who eventually decided not to represent the defendant. Subsequently, this attorney was elected county attorney and prosecuted the defendant for the same offense which he had discussed with him. Although the prosecutor said that he did not remember any of the facts which had been related to him by the defendant or his wife and that he never actually agreed to represent the defendant, the court reversed the conviction. In its opinion the court said:

'An attorney cannot be permitted to participate in the prosecution of a criminal case if, by reason of his professional relations with the accused, he has acquired knowledge of facts upon which the prosecution is predicated or which are closely interwoven therewith.' 289 P.2d at 777.

"In State v. Burns, supra, the defendant retained an attorney who later was elected prosecuting attorney and 'discontinued' his representation of the defendant. The defendant's trial was prosecuted by an assistant who was told nothing about the case by the prosecutor. The Missouri Supreme Court reversed the conviction and observed that: 'We might well hold that the conduct of the trial in the manner here complained of constituted a deprivation of due process.' State v. Burns, supra, 322 S.W.2d at 742. Similarly, it has been held that where a conflict of interest appears, the reversal of a conviction is required even if the defendant is unable to identify specific prejudicial acts on the part of the prosecutor. State v. Detroit Motors, 1960, 62 N.J.Super. 386, 163 A.2d 227; and State v. Burns, supra.

\*      \*      \*      \*      \*      \*

"The record in this case indicates that there is an issue of whether the prosecutor at this appellant's trial had previously served as his defense counsel while a member of the public defender's staff. We believe a hearing is necessary to determine the issue of fact raised by the petition, and should the allegations be well founded a new trial will be required. We reverse for a hearing and possible new trial in accordance with Criminal Procedure Rule 1."

In the case of State v. Brazile, 231 La. 90, 90 So.2d 789, the Supreme Court of Louisiana was confronted with the dis-

qualification of the District Attorney in a murder trial because one of his assistants had, prior to his appointment as Assistant District Attorney, represented the defendant on a previous trial for the same offense. The Assistant recused himself from participating in the trial after joining the staff of the District Attorney. The trial court granted the defendant's motion to recuse the District Attorney and his other Assistant and the State appealed.

The court said:

"Prior to the third trial of defendant for murder, his counsel filed a motion to recuse the district attorney and his assistants for the reason that the second assistant district attorney, Edwin O. Ware, had served as one of the defense counsel at the first trial, this occurring before Mr. Ware's appointment as an assistant district attorney. In advance of the hearing, Mr. Ware filed a motion that he be recused in view of his previous participation in the first trial. The court granted this motion and ordered that Mr. Ware be recused.

"Despite the recusation of Mr. Ware, defendant insisted that the district attorney and his other assistant be rescued, the theory being that, since Mr. Ware is doubtless in possession of vital information concerning the case, there is a possibility that he might have divulged material matters to the district attorney and his staff to the great prejudice of the defense.

"The trial judge acceded to this view, being of the opinion that, due to Mr. Ware's previous relation with defendant and his present position in the district attorney's office, it would be prejudicial to defendant's rights to allow the district attorney and his other assistant to continue to prosecute the case as there is a possibility that Mr. Ware might have divulged to the district attorney some of the highly privileged information given him. Accordingly, he sustained the motion to recuse and the State has prosecuted this appeal from the adverse ruling.

"[1] We think that the judge was in error. The causes for recusation of a district attorney, which are set forth in Article 310 of the Code of Criminal Procedure, R.S. 15:310, cover three separate categories. The only one which could possibly have any bearing on this case is the second cause which provides for the recusation of the district attorney if he '* * * shall have been employed or consulted as attorney for the accused before his election or appointment as district attorney; * * *.' Neither the district attorney nor his first assistant has ever been employed or consulted as attorney for defendant at any time and the fact that Mr. Ware, who has recused himself, is presently employed as the second assistant district attorney affords no ground at all for the recusation of either the district attorney or his first assistant, as they can only be recused for one of the grounds prescribed by law. See State v. Boasberg, 124 La. 289, 50 So. 162.

"[2, 3] Nor is there basis for recusation in the charge that there is a possibility that Mr. Ware has violated the confidential relationship existing between attorney and client. Indeed, it is to be presumed that he, as a member of the bar in good standing, has and will respect the defendant's confidence."

See also State v. Brazile, 234 La. 145, 99 So.2d 62, h. n. 7.

In the case of State v. Miner, 258 A.2d 815, the Supreme Court of Vermont in dealing with a similar matter in a first-degree murder prosecution said:

"The indictment was returned March 22, 1967. At the time of arraignment the respondent was represented by Joseph M. O'Neill, Esquire. The respondent pleaded not guilty and not guilty by reason of insanity. Later, on May 5, 1967, Peter P. Plante, Esquire, of the law firm of Black and Plante, was assigned by the Windsor County Court to represent the respondent.

"At the time of this assignment, and for a brief period thereafter, Frank G. Mahady,

Esquire, a member of the bar of this State, was an associate in the law offices of Black and Plante. While so engaged, Mr. Mahady assisted in the preparation of the defense of the respondent under the supervision of his senior associate, Mr. Plante.

"On August 14, 1967 Mr. Mahady was appointed an assistant attorney general of Vermont. Before that time the attorney general had appeared with the state's attorney of Windsor County representing the State in the preliminary investigation and proceedings before the grand jury, consistent with the provisions of 3 V.S.A. § 157.

"On August 25, 1967 the respondent requested a postponement of the trial and moved that the trial court order the disqualification of the attorney general's office from further participation in behalf of the State in the prosecution of this cause. The motion states that Mr. Mahady had worked closely with respondent's counsel in the case, had interviewed the respondent on different occasions at his place of confinement and was completely familiar with the theory of the defense.

"Before the trial court ruled on the motion, the attorney general requested permission to withdraw from further participation in behalf of the State. The motion states:

" '2. That even though said Frank G. Mahady has, since being employed as an Assistant Attorney General, neither had, nor would have, any connection whatsoever with said cause, in the interests of assuring the Court, the defendant and his counsel that no conceivable advantage could accrue to the State from the fact of said engagement and in the interests of avoiding any possible future claim that the State had such an advantage and that defendant's trial was in any way unfair, it is requested that the foregoing motion be promptly granted;"

"Permission to withdraw was granted to the attorney general's office on September 25, 1967. Shortly before trial the respondent moved to quash and dismiss the indictment because of Mr. Mahady's participation

in the defense and his subsequent employment as assistant attorney general.

"Following a pretrial hearing on the motion, the trial court filed findings of fact. The facts reported on this aspect of the case are not questioned by the respondent. The court determined that Frank G. Mahady, Esquire, upon entering service in the office of the attorney general, was assigned to the opinion and appeals division. In addition to facts previously stated, the findings report:

"5. That upon the employment of Atty. Frank G. Mahady as Assistant Attorney General, all other members of the staff of the Attorney General's office were instructed not to discuss at any time in any manner any case in which the law firm of Black & Plante, or one of their partners, appeared as counsel, and specifically, all members were instructed not to discuss the case of the State of Vermont vs Earl D. Miner, Sr.; and the Court further finds that Attny. Frank G. Mahady has not had access to any file in the Attorney General's office involving any case in which Black & Plante, or one of their partners, appeared as counsel, nor has the said Atty. Frank G. Mahady discussed the case of State of Vermont vs Earl D. Miner, Sr. with any member of the staff of the Attorney General's Office since the date of his employment with that office.

"6. That Windsor County States Attorney James W. Wright has worked in close relationship with the Attorney General's office through the person of Assistant Attorney General Hilton H. Dier, Jr., in the preparation of the case for trial; however, at no time has the States Attorney conferred with Atty. Frank G. Mahady relative to the preparation of the case since his employment in the Attorney General's office;

"7. That since the date of September 25, 1967, wherein the Court granted the Attorney General office's motion to withdraw from further participation in the case of State of Vermont vs. Earl D. Miner, Sr.,

**622**

that the Windsor County States Attorney James W. Wright has conducted his further investigation and preparation for trial of the case without the assistance of anyone in the Attorney General's office;

"8. That at all times material, Atty. Frank G. Mahady has observed the canons of professional ethics as relates to communications between clients and their counsel, and at no time has he divulged any information, which he obtained in the preparation of the case, to the State of Vermont or any member of the Attorney General's office, or the person of the Windsor County States Attorney, James W. Wright.

"9. The Court further finds that at all stages of the proceedings the respondent has been represented by able and competent counsel, and that his rights to a fair and impartial trial have been protected at all stages of the proceedings.

"On the strength of these factual determinations, the motion to dismiss the indictment was denied. The correctness of this order presents the first question for our review.

"It is of first importance, in resolving this claim of error, that there is no indication in the record that the confidential relationship which was established between the respondent and the law firm of Black and Plante was violated in any way. None has been claimed, either at the trial or in this appeal.

"Nonetheless the respondent contends—'(t)he fact that the confidential information was not used and in absence of any adverse instances on the part of the attorney accepting such employment or the person employing him is immaterial.' He lays claim to the assumption that the sequence of Mr. Mahady's employment by adverse interests encroached upon his right to a fair trial. And the respondent points out that only he can waive the privilege of his communications with his counsel and the fact that the attorney general's office withdrew from the prosecution does not affect the privilege.

"[1] The precept that an attorney scrupulously avoid representing conflicting interests and hold inviolate the confidence and secrets entrusted to him by his client are not open to question. The attorney's obligation in this respect has been defined by former Chief Justice Cleary, writing for the Court in In re Themelis, 117 Vt. 19, 23, 83 A.2d 507, 510;

" 'He should refrain from accepting any employment which may require him to do anything which will injuriously affect his former client in any matter in which he formerly represented him, and where he may be called upon in his new relation, to use against his former client, any knowledge or information acquired through his former connection. Paramount duties of a lawyer are to see that justice is done, to aid in its administration, to assist in preserving the dignity and authority of the court before the public and to keep the trust and confidence that a client has placed in him.'

"[2, 3] Fidelity to these standards prohibits an attorney from engaging in a criminal proceeding against an accused he has formerly represented in the subject matter of the prosecution. But a conflict of this consequence will not bar the State, as distinguished from a disqualified representative, from protecting the public interest. Other counsel who have not been subject to any conflict may appear for the State where the prosecutor's function can be performed impartially and free from any breach of privileged communications. See People ex rel. Livers v. Hanson, 290 Ill. 370, 125 N.E. 268, 270.

"[4] The shield of privilege sometimes runs counter to the law's great purpose to ascertain the truth. Baird v. Koerner, 9 Cir., 279 F.2d 623, 95 A.L.R.2d 303, 314. The application of the rule should not exceed the reason for the privilege nor the policy which brought it into being. Foster v. Hall, 29 Mass. (12 Pick.) 89, 97 (Shaw, C.J.); In re Selser, 15 N.J. 393, 105 A.2d 395, 402.

"[5] The design and force of the rule is against disclosure. On that issue, all are agreed that the seal of secrecy has not been broken; no confidence has been betrayed and the privilege is observed. In this situation, the State is entitled to proceed, free from the disqualifying interest of one of its employees.

"Mr. Mahady's appointment to the attorney general's staff occurred several months after the indictment was returned, and there is no suggestion that he had any part in its procurement. The denial of the motion to dismiss the presentment was without error. And since there is no question that the respondent's privileged communications with Mr. Mahady were faithfully observed and kept throughout the trial, the claim that his right to a fair trial has been impaired by Mr. Mahady's employment by the State of Vermont is without merit."

The trial court in the instant case did precisely what the Florida court in *Young,* supra, said must be done in such situations. That is, conduct a factual hearing to determine whether there was a breach of the attorney-client relationship. He found none and we agree with his finding and his ruling in denying appellant's motion.

An excellent annotation on this subject is found in 31 A.L.R.3rd beginning on page 953.

The record reflects that in 1969 there was a series of robberies in the City of Mobile involving laundry and dry cleaning establishments and a murder was committed during one of these robberies. The police were informed (by an informer whose information in the past was reliable) that appellant was the individual or one of the individuals involved in these robberies and murder. On June 26, 1969, Mrs. Pearlie Rone was employed by Chin's Cleaners at its branch office on Conception Street in that city. She testified that around eleven o'clock A. M. on that date, a colored male came in and asked her if he could get some pressing done. She told him they didn't do pressing at the branch and that it was too late to send work to the main plant. He left and returned shortly after three o'clock P. M. on the same day. Mrs. Rone was alone in the place of business. This man grabbed her throat with both hands and while choking her, he pushed her into the back of the building formerly used as the dry cleaning department. She asked him not to put her back there, that he could have the money if he wanted it. He forced her to lie on her stomach and tied her hands together, tied her feet together and then tied her feet to her hands. He used silk stockings in tying her up. He put a paper towel in her mouth to gag her and tied a grass rope around her mouth and head. He pulled up her dress, put his hands on her privates and asked her an insulting question. He went to the cash register and she heard him open it. There was about a hundred dollars in the register and when she checked the register later it was empty. He asked her about her purse and she mumbled that it was on the shelf. He got her purse and came back to where she was lying. She observed him open her purse and remove her billfold. He took forty dollars from the billfold and then opened her make-up kit and took thirty-five cents. He told her that he saw her driver's license and that if she told anyone about this he would kill her and burn her home down. He again put his hand on her privates. He asked her if there was a back door to the place and she told him no and he walked out the front door.

She stayed on the floor about five minutes after he left as she was afraid. She then got up and called the main office and the police. When the police arrived, she showed them where she was tied up and the officers took the stockings and grass rope which were later introduced in evidence without objection. She told the officers that the man was not too tall and not too short, kind of slim. She described how he was dressed; that he was wearing a gray knit shirt with stripes in front, olive colored pants, wearing sunglasses and had a dark complexion.

About a month after the robbery, Mrs. Rone was called to the station house to view a lineup. She viewed three lineups in all. She did not recognize anyone in the first two lineups. Hannon was not in the first two lineups. In the third lineup, she identified the Number 3 man as the man who robbed her. Number 3 was Hannon.

Appellant sought to suppress her in-court identification on the ground that it was tainted by an illegal lineup.

Prior to the lineup, the officers did not tell Mrs. Rone they had a suspect. They only told her to look at the lineup and see if she could identify anybody. There were seven men in the lineup and she identified Hannon as the man who robbed her. She testified on voir dire that there was no reason to ask anybody for any reassurance that she had picked out the right man because she knew that he was the right man. She said there was never any doubt in her mind as to the identity of her assailant. She said, "the only thing I know is his face, I know that every time I see it. I know it was him. I just knew his face. It was not because I saw him in the lineup. It was because I saw him when he robbed me."

Before the jury, she testified as follows:

"Q. All right now, would you look around this courtroom and tell the Jury if that same man's in this courtroom to-day that came in and grabbed you?

"A. Yes.

"Q. And you're indicating, pointing toward the Defendant, Michael Hannon?

"A. That's right.

"Q. And are you sure that's the same man that came in and grabbed you around your throat?

"A. I'm sure.

"Q. And robbed you?

"A. That's right.

*     *     *     *     *     *

"Q. All right now Mrs. Rone, about how long in your best opinion did he have his hands around your throat backing you to the wall when he came in?

"A. Gosh, I reckon about a minute or two.

"Q. All right and he was standing right in front of you?

"A. Right in front of me.

"Q. And you were looking him right in the face?

"A. That's right.

"Q. And then did you have occasion to look right in his face again?

"A. Well when he was getting the money out of my purse, I raised by head over like this (indicating) and I could see him.

"Q. And in your best judgment how long was it did you get a chance to sit there and look at the man?

"A. I imagine all together I probably looked at him about five minutes.

"Q. Five minutes? And you're positive this is the man right here (indicating the Defendant)?

"A. I'm positive.

*     *     *     *     *     *

"Q. And did you pick out anybody out of that lineup as being the man who robbed you?

"A. The third time I picked out this boy right here (indicating the Defendant).

"Q. This boy (indicating the Defendant)? And do you remember what number he was?

"A. Three.

"Q. Number 3? Did you tell the Police officer then that you picked one out?

"A. When they asked me, I told them. I didn't say a word until they asked me.

"Q. All right now, and they asked you did you pick somebody out? What did you tell them?

"A. Number 3.

"Q. And were you positive?

"A. I was positive and I am positive."

After appellant was brought to the station house and before the lineup, he was advised of his rights. He was told that he was suspected of being involved in a series of robberies and murder and that he was going to be put in a lineup. He was advised as to his right to have an attorney present.

"Q. All right, and after he was advised of his rights, did he ask for an attorney to be present at the lineup?

"A. No, sir, we have the forms to advise the defendant of his rights as far as the attorney, he can waive those rights and proceed with the lineup or he can request an attorney and an attorney will be present at the lineup if he so desires. If the Defendant wants to proceed with the lineup, then we go ahead with the lineup and in this particular instance, the Defendant said he would proceed with the lineup. We had told him what we were going to have the lineup for, sir."

Mrs. Rone was positive that the man who came in the place that morning was the same man who came back that afternoon and robbed her. She said appellant was in her presence ten to fifteen minutes and for at least five minutes she looked him squarely in the face. On voir dire and cross-examination, she was not shaken in her identification.

■ We hold that the in-court identification was not tainted by the lineup. This is a clear case on "independent source." She knew him because she "eye-balled" him for five minutes during the robbery. Robinson v. State, 45 Ala.App. 236, 228 So.2d 850; Grace v. State, 44 Ala.App. 682, 220 So.2d 259; State v. Allen, 251 La. 237, 203 So.2d 705.

■ Appellant urges that there was reversible error in the trial court's refusal to grant a mistrial because of the testimony of Detective Walter Pickett to the effect that a reliable informer stated that Michael Hannon was the individual involved or one of the individuals involved in a series of laundry robberies, and that after receiving this information, they later learned that Hannon was confined in another police department on another charge. We cannot agree. Any error in this regard was completely cured by the court's instructions to the jury wherein he said:

"THE COURT: Just a minute Mr. Graddick. Let me say this to you members of the Jury, the witness here testified earlier when you were sent out, made a statement to the effect that the Defendant in this case was—that he had a report from a reliable informer that he was involved in a series of robberies. He further testified that the Defendant was in jail pending another case. Now that testimony shall, at this time, the Court instructs you to completely disregard that testimony, I want you in every way to eradicate that from your mind, its not to be considered as a part of the evidence in this case, its inadmissible and should not be considered by you. You should not linger on it and just completely disregard it in your deliberations of this case when it comes to that time. All right let's go ahead."

See Dufresne v. State, 40 Ala.App. 476, 116 So.2d 385; Sims v. State, 253 Ala. 666, 46 So.2d 564; Pope v. State, 39 Ala.App. 42, 96 So.2d 441, certiorari denied 266 Ala. 699, 96 So.2d 447.

Appellant was represented by able, diligent and competent counsel. He displayed a marked degree of ingenuity. The case was vigorously tried below. It has been thoroughly presented to this court. In

addition to the matters called to our attention in brief, we have searched the record for errors. We have found none affecting Hannon's substantial rights and the case is due to be affirmed. It is so ordered.

Affirmed.

CATES, P. J., and ALMON, TYSON, and DeCARLO, JJ., concur.