Rel: June 28, 2024

**Notice:** This opinion is subject to formal revision before publication in the advance sheets of **Southern Reporter**. Readers are requested to notify the **Reporter of Decisions**, Alabama Appellate Courts, 300 Dexter Avenue, Montgomery, Alabama 36104-3741 ((334) 229-0650), of any typographical or other errors, in order that corrections may be made before the opinion is published in **Southern Reporter**.

# Alabama Court of Criminal Appeals

## OCTOBER TERM, 2023-2024

_____

## CR-2022-1258

_____

## C.C.

### v.

### State of Alabama

### Appeal from Russell Circuit Court
### (CC-16-664, CC-16-665, CC-16-489, CC-16-490, CC-17-774, and CC-17-775)

McCOOL, Judge.

C.C. appeals his convictions for first-degree sodomy, see § 13A-6-63, Ala. Code 1975; three counts of first-degree rape, see § 13A-6-61, Ala. Code 1975; enticing a child for immoral purposes, see § 13A-6-69, Ala. Code 1975; incest, see § 13A-13-3, Ala. Code 1975; and third-degree

domestic violence, see § 13A-6-132, Ala. Code 1975. The trial court sentenced C.C. to life imprisonment for his sodomy and rape convictions, 10 years' imprisonment for his enticing-a-child and incest convictions, and 1 year's imprisonment for his domestic-violence conviction.

Facts and Procedural History

In 2016, a Russell County grand jury indicted C.C. for one count of first-degree sodomy, one count of first-degree rape, one count of enticing a child for immoral purposes, and one count of third-degree domestic violence. Those sexual-offense charges were based on acts C.C. allegedly committed against his daughter, A.G., and the domestic-violence charge was based on an act C.C. allegedly committed against D.G., who was his wife at the time.[1] D.G. sought and was granted a divorce from C.C. at some point after those alleged offenses occurred. The State brought C.C. to trial on those charges in June 2017, but the trial court declared a mistrial after the jury stated that it was unable to reach verdicts.

---

[1]At the time of the offenses that occurred in this case, A.G. and D.G. shared C.C.'s last name, making their initials A.C. and D.C. However, we have used the initials A.G. and D.G. because those were the victims' initials at the time of trial.

In August 2017, a Russell County grand jury indicted C.C. for two additional counts of first-degree rape and one count of incest. Those charges were also based on acts C.C. allegedly committed against A.G. The State brought C.C. to trial a second time in July 2022. According to the State, "[o]n the eve of his … retrial, [C.C.] moved to have the Russell County District Attorney's Office disqualified from prosecuting his case on the grounds that," on July 9, 2018, C.C. had "met and discussed his case with subsequently-elected Russell County District Attorney Rich Chancey," who at that time worked as a defense attorney, and had "disclosed to Chancey … information of a sensitive and material nature." (State's brief, p. 4.) The transcript of C.C.'s 2022 trial begins with the following colloquy, which occurred after voir dire and before the jury was selected:

> "THE COURT: Let's address the issue regarding [C.C.'s] consultation with Mr. Chancey. Over the break it's my understanding, Mr. Chancey, you have consulted with both the Office of Prosecution Services and the Alabama State Bar; is that correct?
>
> "CHANCEY: Correct.
>
> "THE COURT: And what guidance did you receive?
>
> "CHANCEY: Your Honor, the Office of Prosecution Services told me they didn't have a bright line answer to that,

3

and it'd be better if I called the State Bar and get an ethics opinion. I spoke to Mr. Tripp Vickers and told him … that we had started today's trial with voir dire and what the charge was. I also went back and indicated that [C.C.] had said that I had consulted -- or he had consulted with me. I'd originally thought I had not, but, upon further review, my office was able to go back and find [that,] on July 9, 2018, my notes indicate that he came in, indicated the charges, indicated it was a mistrial in 2017. And, Judge, this is all public record, so I'm not going to state anything that wasn't. There was going to be a July 27, 2018, docket call and an August 27, 2018, trial date at 9:00 a.m., that Curtis Bernard was his attorney, and I quoted him -- of course he said he wanted a trial; he wasn't guilty -- but I quoted him a $50,000 quote, and … he said he had a transcript. I didn't get the transcript. I said my quote was $50,000, and that's the summary of my notes. There's nothing in there about the facts of the case. I have no specific recollection of this consultation, and I don't have any information other than he indicated he was not guilty and was going to be retried in a month from this consultation.

"THE COURT: In your notations, are there things beyond the public things that you just stated; are there things beyond that in your notations. Obviously, I'm not asking what are they. I'm asking if there's anything beyond.

"CHANCEY: There's one thing, Judge, one line, but I don't -- I don't see -- and, again, I don't know what his defense was in the first trial, but I can show his attorneys what -- if it's okay with him -- what he said. I've got one sentence.

"THE COURT: All right. Defense attorneys, would [C.C.] be willing to waive any confidentiality to allow you to view the one sentence from his consultation with Mr. Chancey? Do you know what I'm saying?

"[LEAD DEFENSE COUNSEL]: Do you want me to look at that?

4

"[C.C.]: Uh-huh.

"THE COURT: For the record, [C.C.] said you can look at it.

"CHANCEY: All right. So this is a screen shot of my legal pad. There's the charge.

"(Defense counsel review Mr. Chancey's notes from consultation.)

"THE COURT: Does that affect anything?

"[LEAD DEFENSE COUNSEL]: Judge, I did read that last sentence. Obviously, there was some information that was divulged from [C.C.] to Mr. Chancey, for him to write that sentence down, on this situation. And the thing in a case of this magnitude, Judge, just the appearance of any kind of impropriety in and of itself causes a great deal of distress, and we would say that there is a conflict, there was a conflict, and that Mr. Chancey actually working to get this case … ready for trial today does make it a situation that needs to be dealt with, potentially even to be sent off to the [Attorney General's] office for a trial of this magnitude. I don't think that we could proceed based on prior consultations and prior work done and communication between [C.C.] and Mr. Chancey, and Mr. Chancey not being screened out of this case.

"….

"THE COURT: May I see the line?

"[LEAD DEFENSE COUNSEL]: Yes, sir.

"….

"(The court reviews the note.)

5

"CHANCEY: And that's typically [a] line I get in all consultations, used to get. I don't see how that's a defense.

"THE COURT: No, I don't see how that would be anything. An additional question I have is, was anyone else present during the consultation?

"[LEAD DEFENSE COUNSEL]: I believe [C.C.'s] [current] wife was.

"THE COURT: Were they married at the time?

"(Positive response from [C.C.])

"....

"THE COURT: Well, under the Rules of Evidence, in an action there's no spousal privilege when one of the alleged victims is the child of one of the parties, and so any disclosures made in the presence of the wife would be a disclosure in front of a third party, which would further weaken the claim of any confidentiality which would require this to be sent to the [Attorney General's] office. Based upon Mr. Chancey's continued assertions that he had no recollection of this, and based on the fact, like I just said, any communications in the presence of a third party would waive any confidentiality issues, I'm going to find that this can proceed without having to go to any other jurisdiction or another prosecuting office.

"[LEAD DEFENSE COUNSEL]: Judge, we'd just ask that our objection be put into the record for the preservation of the record.

"THE COURT: All right. Also, additionally, for purposes of the record, … there was extensive testimony by [C.C.] in that first trial, so unless there was something that -- well, like

6

I said, Mr. Chancey's already said he doesn't have any recollection of the consultation.

"[ASSISTANT DEFENSE COUNSEL]: Your Honor, will you allow us ... to do a mandamus because I think it's a very vital situation right now. I know you want to go ahead and get this over because it's been hanging around for so long, but our client's been hanging on, too.

"THE COURT: Continue striking, and I'll think about that, and I'll get back to you.

"[ASSISTANT DEFENSE COUNSEL]: Thank you.

"[CHANCEY[2]]: I don't know if this is a relevant question, but I'm wondering is he alleging that he told me something that is going to be -- that me, knowing it, is going to, in any way, jeopardize his defense. Does he think he told me something? Because, if he does, then that may be of interest. I don't know. If he says he didn't tell me anything that wasn't in the trial -- you know, I'm curious what the -- so far, I don't see where he's told me anything that would create a conflict. But is he trying to say that he told me something that wasn't brought out in the first trial that would be of --

"THE COURT: Is that the contention, is that there were disclosures beyond what was testified to?

"[ASSISTANT DEFENSE COUNSEL]: Well, number one, he doesn't know what he said.

"CHANCEY: Right. Exactly.

---

[2]The court reporter attributes this statement to the trial court, but, in context, it is clearly Chancey who is speaking.

7

"[ASSISTANT DEFENSE COUNSEL]: So, if he doesn't know what he said, he may have said something to -- I mean, talking about a $50,000 fee, that's --

"THE COURT: Does [C.C.] know what [C.C.] said?

"[ASSISTANT DEFENSE COUNSEL]: I don't know.  I just found out about this an hour and a half ago.

"THE COURT: Well, you can ask your client.

"CHANCEY: If he's saying he told me something that would jeopardize his trial, from my notes I don't see anything that he said that would jeopardize the trial, but I don't see how just the -- in my understanding the rule is a bare consultation, alone, doesn't create a conflict.  It's a consultation, and I don't have anything to assert to the court other than what I've shown.

"[LEAD DEFENSE COUNSEL]: My understanding from [C.C.] is that all of the information that was divulged to me in preparation for his defense, he had talked about during the consultation.

"THE COURT: All the information that he's divulged to you in your preparation for this trial, he divulged to Mr. Chancey in a single consultation?  How long have you been representing [C.C.]?

"[LEAD DEFENSE COUNSEL]: I've represented [C.C.] now since 2020.

"THE COURT: Okay.  For two years how many times have you met with [C.C.]?

"[LEAD DEFENSE COUNSEL]: I've met with him several times, Judge.  I can't -- I guess I can't pick a number off the top of my head what that was, but --

8

"THE COURT: Have you met with him more than four hours?

"[LEAD DEFENSE COUNSEL]: -- but, the first time he met with me, it was for a good bit, Judge, where we talked about a lot of the things that -- included in this trial.

"THE COURT: You just stated that he disclosed to Mr. Chancey, in a single consultation, everything that he's disclosed to you.  How many hours have you met with [C.C.]?

"....

"[LEAD DEFENSE COUNSEL]: I think, total, we might have spent maybe 20 hours or so.

"THE COURT: And I'm sure it wasn't a 20-hour consultation?

"CHANCEY: I've never had one, Judge, that -- 30 minutes.

"THE COURT: Keep striking the jury.

"(A jury was struck outside the presence of the court reporter.)

"THE COURT: Before we address the Batson[3] [claim], I'm not going to suspend the proceedings to allow the filing of a [petition for a] writ of mandamus, but, you know, obviously you can file whatever you feel necessary.

"[LEAD DEFENSE COUNSEL]: Yes, sir."

---

[3]Batson v. Kentucky, 476 U.S. 79 (1986).

9

(R. 3-13.) It does not appear that C.C. filed a petition for a writ of mandamus regarding the recusal issue.

The State's evidence at trial tended to establish the following facts. On January 10, 2016, D.G. went shopping while A.G., who was 15 years old, was at home watching television with C.C. and her older brother, B.G., who was 17 years old. When D.G. arrived home, her family was no longer watching television, so she went to the bedroom she shared with C.C., expecting to find him taking a nap. Instead, when D.G. went into the bedroom, she saw C.C. standing next to the bed, A.G. lying on the bed, and both C.C. and A.G. were "naked from the waist down." (R. 335.) D.G. screamed when she saw C.C. and A.G. in the bedroom, and C.C. began attempting to "push[ ] [her] out of the bedroom." (R. 342.) However, D.G. managed to "get [her] leg … wedged in the door" (R. 346), and C.C. began "slamming [the] door as hard as he [could] … on [her] upper right thigh." (Id.) B.G. was playing video games in his bedroom at that time, and, when he heard D.G. scream, he ran to his parents' bedroom. B.G. confirmed that C.C. was "slamming the [bed]room door as hard as he [could] on [D.G.'s] leg," and he also confirmed that both C.C. and A.G. were "naked from the waist down." (R. 54.) Together, D.G. and

B.G. were able to force their way into the bedroom, where D.G. began "lecturing" C.C. about what she believed was inappropriate behavior. (R. 357.) According to D.G., C.C. claimed that he and A.G. were naked from the waist down because A.G. had vomited, but neither D.G. nor B.G. smelled vomit, and A.G. said: "Mama, I didn't throw up." (R. 359.) D.G., A.G., and B.G. then ran from the house and sought help from a neighbor, who telephoned 911.

A.G., who was 21 years old at the time of trial, testified that the reason she was partially naked in her parents' bedroom on January 10, 2016, was because C.C. had instructed her to go into the bedroom and remove her clothes. A.G. also testified that C.C. had "put his penis inside of [her] vagina" on that occasion (R. 498), and she testified that that was not the first time C.C. had sexually assaulted her. According to A.G., on three separate occasions in November and December of 2015, C.C. had instructed her to go into her parents' bedroom and undress, had put his penis "in her butt" (R. 482) on the first of those occasions, and had put his penis in her vagina on the other two occasions.

In March 2016, A.G. was diagnosed with chlamydia, a sexually transmitted disease, and she testified that she had contracted the disease

11

as a result of "sexual contact with [her] dad." (R. 515.) Sgt. Mark Rogers of the Phenix City Police Department testified that, after he was informed of A.G.'s diagnosis, he contacted Teresa Dyer, a nurse at the Russell County jail, and asked her to take a urine sample from C.C., which, when tested, reflected that C.C. was "positive for chlamydia." (R. 201.)

## Discussion

C.C. raises three claims on appeal that, he says, entitle him to relief from his convictions and sentences. We address each claim in turn.

## I.

C.C. argues that the trial court erred by ruling that "the [Russell County] District Attorney's Office was not required to recuse itself from trial" and by "failing to suspend trial to allow [his] counsel to file a [petition for a] writ of mandamus." (C.C.'s brief, p. 10.) According to C.C., recusal was required because he had consulted with Chancey about his pending charges in 2018, before Chancey was elected to serve as the Russell County district attorney.[4] In support of his claim, C.C. cites

---

[4]The State claims in its brief to this Court that Chancey did not begin serving as the Russell County district attorney until December 2022, approximately five months after C.C.'s July 2022 trial. Thus, the

12

Hannon v. State, 48 Ala. App. 613, 266 So. 2d 825 (1972), and Smith v. State, 639 So. 2d 543 (Ala. Crim. App. 1993).

In Hannon, the trial court appointed three public defenders, including Randy Butler, Jr., to represent Michael Hannon, who was charged with robbery. Butler, however, did not actually represent Hannon in his first trial, which ended in a mistrial. In his second trial, Hannon was represented by a different public defender, who moved to dismiss the charges, or, alternatively, for a change of venue, based on the fact that Butler was by that time the Mobile County district attorney.

> "A full blown hearing was had and testimony taken. It developed that Mr. Butler did interview Hannon in jail and subsequently filed a motion in his behalf to produce certain items in connection with the case. This was prior to the first trial and Mr. Butler had no further contact or communications with Hannon. Out of an abundance of precaution and to scrupulously protect the rights of appellant and to allay any implications of impropriety, the trial judge sent for Mr. Butler to come to his courtroom and give testimony as to his relations with the defendant. Mr. Butler testified that he had no independent recollection about the case, but stated that

---

State argues, it is unclear "how Chancey could have been conflicted out of the case before he ever took office." (State's brief, p. 4.) However, even if Chancey did not take office until December 2022, it is evident from the colloquy quoted above that he was employed in the Russell County district attorney's office at the time of C.C.'s July 2022 trial. Indeed, Chancey was present during the trial and made brief legal arguments to the trial court at various times, though he did not question any witnesses or make arguments to the jury.

13

Hannon's face was familiar and he felt certain that he had interviewed him at one time and this probably took place in the county jail. He requested permission to look at the court file to refresh his recollection and there found a motion bearing his signature. He also recognized the name of the victim of the robbery …. Other than this, he could not recall anything else about the case. He forthrightly testified that he had not discussed this case with his assistant in charge of the prosecution and further that he had not mentioned this case or any other case to the personnel of his office that came to or passed through the Public Defender's Office during the nearly two years that he was connected with that office."

Hannon, 48 Ala. App. at 614, 266 So. 2d at 826. The trial court denied Hannon's motions, and he was convicted of robbery. On appeal, this Court stated:

"The relationship of attorney and client is one of the most sacred relationships known to the law and places upon the attorney a position likened to a fiduciary calling for the highest trust and confidence, so that in all his relations and dealings with his client, it is his duty to exercise the utmost honesty, good faith, fairness, integrity and fidelity, and he may not at any time use against his former client knowledge or information acquired by virtue of the previous relationship. This rule is universal and hoary with age.

"To permit a District Attorney to prosecute his former client, or to divulge to one of his assistants, in charge of the prosecution, the confidential information imparted to him by the client, can never be sanctioned. It would constitute an act wholly at war with due process of law. The injury would not be limited to the defendant -- there is injury to the entire system of justice, to the law as an institution, to the community at large, to the democratic ideal reflected in the processes of our court, and would destroy the last vestige of

14

public confidence and respect in the administration of our criminal laws.

> "The record in this case clearly shows that the District Attorney did not divulge the confidential information he gained from Hannon while he was a member of the Public Defender's Office. He had not been elected District Attorney when the grand jury indicted Hannon and had no connection therewith. He inherited for prosecution all indictments returned by grand juries in Mobile County not disposed of while his predecessor was in office. The public interest demanded that the prosecution go forward. There has been no breach of the attorney-client relationship, the privilege against disclosure has been preserved, and professional ethics, painstakingly observed, and the constitutional guarantee of a fair and impartial trial was not infringed."

Hannon, 48 Ala. App. at 618, 266 So. 2d at 829 (emphasis omitted).

In Smith, this Court addressed a similar situation and found no error in the trial court's refusal to order the Covington County district attorney's office to recuse itself from the defendant's trial:

> "The appellant … contends that the trial court committed reversible error by failing to order the Covington County district attorney's office recused from the trial. After the appellant was arrested but before a preliminary hearing, Mr. Charles Alex Short was appointed as counsel for the appellant. Mr. Short met with the appellant at the county jail for approximately 15 minutes. Shortly thereafter, Mr. Short accepted employment with the district attorney's office. He filed a motion to withdraw as counsel, and that motion was granted, and new counsel was appointed before the preliminary hearing.

15

"The appellant filed a motion to have the district attorney's office recuse itself. A hearing was held on the motion, in which Mr. Short testified that he has not discussed this case with anyone at the district attorney's office, that he did not bring any file regarding this case to the district attorney's office, and that he did not and would not assist the district attorney's office in any manner toward prosecuting the appellant.

"In <u>Hannon v. State</u>, 48 Ala. App. 613, 266 So. 2d 825 (1972), the defendant had conferred with a public defender who was later elected district attorney. Subsequent to being elected, the district attorney did not take part in prosecuting the defendant and did not give his assistants any information obtained during his conversations with the defendant. We affirmed the defendant's conviction in <u>Hannon</u> because we found no breach of the attorney-client relationship. Our holding in <u>Hannon</u> applies to this case. Mr. Short did not breach the attorney-client relationship because he abstained from any participation in the prosecution of the appellant and he revealed no confidential information regarding his former client to anyone at the district attorney's office."

<u>Smith</u>, 639 So. 2d at 548.

C.C. argues that his case is distinguishable from <u>Hannon</u> and <u>Smith</u> because, he says, "it is clear that sensitive information regarding these cases was provided to Chancey" during their 2018 consultation. (C.C.'s brief, p. 12.) However, contrary to C.C.'s contention, there is no evidence indicating that he ever shared any "sensitive information" with Chancey. Instead, Chancey explained that he had met with C.C. for no more than 30 minutes approximately four years before C.C.'s 2022 trial,

16

that he had "no specific recollection of th[e] consultation," that there was "nothing in [his notes] about the facts of the case," that he never "g[o]t the transcript" of C.C.'s first trial, and that he did not "have any information other than [C.C.] indicated he was not guilty and was going to be retried in a month from this consultation." When the trial court asked him if there were "things beyond that in [his] notations," Chancey said that there was "one sentence" that the trial court might want to see. Chancey's notes are not included in the record on appeal, so this Court cannot review that sentence for itself; however, the trial court reviewed the sentence and stated: "I don't see how that would be anything." We note that C.C.'s counsel made the following statement at the recusal hearing: "My understanding from [C.C.] is that all of the information that was divulged to me in preparation for his defense, he had talked about during the consultation [with Chancey]." However, defense counsel's unsworn statement was not evidence. State v. R.C., 195 So. 3d 317, 322 (Ala. Crim. App. 2015). Moreover, it is evident from the colloquy quoted above that the trial court did not believe C.C.'s allegation to his counsel regarding what information he had shared with Chancey. Thus, there is

no evidence upon which to base the conclusion that C.C. shared "sensitive information" with Chancey.

Furthermore, even if C.C. did share "sensitive information" with Chancey, the trial court correctly concluded that, given the specific facts of this case, the information was not protected by the attorney-client privilege. "It is well settled that, absent some exception to the attorney-client privilege, '[t]he contents of a confidential communication between an attorney and his client are privileged ….'" Ex parte Alfa Ins. Corp., 284 So. 3d 891, 904 (Ala. 2019) (quoting Ex parte Alfa Mut. Ins. Co., 631 So. 2d 858, 859-60 (Ala. 1993)). However, it is equally well settled that, when a defendant consults with his attorney in the presence of a third party, "[t]he presence of such third party defeats the confidential nature of the conference and thereby the privilege," Lynch v. Hamrick, 968 So. 2d 11, 15-16 (Ala. 2007) (citations omitted), unless the third party has "a sufficient common legal interest in the subject matter' of the representation," id. at 16 (quoting Crenshaw v. Crenshaw, 646 So. 2d 661, 663 (Ala. 1994)), or the third party's presence is necessary for successful communication between the defendant and his attorney. See Branch v. Greene Cnty. Bd. of Educ., 533 So. 2d 248, 255 (Ala. Civ. App.

1988) ("[T]he [attorney-client] privilege does ... exist when ... client to attorney communications are made in the presence of a third party whose presence is ... necessary for the successful communication between the attorney and the client."); and Rule 502(a)(5), Ala. R. Evid. ("A communication is 'confidential' if not intended to be disclosed to third persons other than those to whom disclosure is made in furtherance of the rendition of professional legal services to the client or those to whom disclosure is reasonably necessary for the transmission of the communication.").

Here, C.C.'s counsel conceded during the recusal hearing that C.C.'s current wife was present during C.C.'s brief consultation with Chancey, and there is no indication or contention that C.C.'s wife had a "legal interest" in the subject matter of the consultation, Lynch, 968 So. 2d at 16 (citation omitted), or that her presence was "necessary for the successful communication between [Chancey] and [C.C.]" Branch, 533 So. 2d at 255. We recognize, of course, that confidential information exchanged between spouses is also generally privileged. See Rule 504, Ala. R. Evid. However, Rule 504(d)(3)(B) provides that "[t]here is no [spousal] privilege ... [i]n a criminal action or proceeding in which one

spouse is charged with a crime against … a minor child of either." Thus, because C.C. was charged with crimes against his minor child, any information he shared with his wife was not privileged, which means that his wife was no different than any other unnecessary third party whom he might have chosen to include in his consultation with Chancey. Therefore, in this particular case, any information C.C. shared with Chancey in the presence of C.C.'s wife was not protected by the attorney-client privilege. See State v. Rhodes, 627 N.W.2d 74, 85 (Minn. 2001) ("Because [the defendant's wife] was a nonclient third party, her presence prevented the attorney-client privilege from attaching.").

A trial court has broad discretion in determining whether an attorney (or, in this case, an entire district attorney's office) should be disqualified from a defendant's trial. Ex parte Terminix Int'l Co., LP, 325 So. 3d 800, 804 (Ala. 2020). In this case, there is no basis for finding that there was a "breach of the attorney-client relationship" or that the "constitutional guarantee of a fair and impartial trial was … infringed" by the fact that the Russell County district attorney's office prosecuted C.C. Hannon, 48 Ala. App. at 618, 266 So. 2d at 829. Thus, we cannot

say that the trial court exceeded its discretion by refusing to order the Russell County district attorney's office to recuse itself from C.C.'s trial.

As for his claim that the trial court should have "suspend[ed] trial to allow [his] counsel to file a [petition for a] writ of mandamus," C.C. cites no authority and makes no attempt whatsoever to expound on the claim. (C.C.'s brief, p. 11.) In fact, C.C.'s entire "argument" in support of this claim is that "the [trial] court should have suspended trial to await a decision on a [petition for a] writ of mandamus" (id., p. 12), which is not an argument at all but merely a conclusory allegation of trial-court error. Thus, we will not consider this claim. See Egbuonu v. State, 993 So. 2d 35, 41 (Ala. Crim. App. 2007) (refusing to consider the defendant's claim because he had cited no authority in support of the claim and because his "argument" consisted of nothing more than a conclusory allegation of trial-court error); Johnson v. City of Mobile, 195 So. 3d 903, 921 (Ala. 2015) ("Johnson cites no authority for this argument; thus, we will not consider it."); and Tucker v. Cullman-Jefferson Cnty. Gas Dist., 864 So. 3d 317, 319 (Ala. 2003) ("When an appellant fails to properly argue an issue, that issue is waived and will not be considered." (citation omitted).

II.

C.C. argues that the trial court erred by admitting evidence indicating that his urine tested positive for chlamydia following his arrest. According to C.C., that evidence was inadmissible because the State collected his urine without a search warrant, which, C.C. says, violated the Fourth Amendment to the United States Constitution. However, the record does not indicate that C.C. ever raised his Fourth Amendment argument below, and he did not object to any of the testimony regarding his chlamydia diagnosis. Thus, C.C. failed to preserve this claim for appellate review, and, as a result, we will not consider it. See Alonso v. State, 228 So. 3d 1093, 1102 (Ala. Crim. App. 2016) ("Below, Alonso did not argue that law-enforcement officers violated his Fourth Amendment right when they searched the contents of the telephone. Therefore, this issue was not preserved for this Court's review and does not entitle Alonso to any relief."). We acknowledge C.C.'s argument that we should find "plain error" in the trial court's admission of the evidence of his chlamydia diagnosis (C.C.'s brief, p. 13), which essentially serves as an admission that he did not raise this claim below. However, this Court has repeatedly explained that plain-error review is not applicable in cases in which the death penalty has not been imposed.

22

See, e.g., <u>Keaton v. State</u>, 375 So. 3d 44, 71 (Ala. Crim. App. 2021); and <u>Pendleton v. State</u>, 208 So. 3d 45, 48 (Ala. Crim. App. 2015).

## III.

C.C. argues that his sentences must be reversed and the case remanded for a new sentencing hearing because, he says, he was not afforded an opportunity to make a statement before the trial court imposed his sentences, as required by Rule 26.9(b), Ala. R. Crim. P. Although C.C. did not raise this claim below, this Court has held that "'the requirement that the defendant be afforded the opportunity to speak on his or her behalf at the sentencing hearing [is an] exception[ ] to the general preservation rule and [is] required to afford a defendant the minimal due process.'" <u>Green v. State</u>, 200 So. 3d 677, 678 (Ala. Crim. App. 2015) (quoting in turn <u>Banks v. State</u>, 51 So. 3d 386, 392 (Ala. Crim. App 2010)). Thus, this issue is properly before this Court.

C.C. correctly notes that the trial court did not afford him an opportunity to make a statement before the court imposed his sentences. Thus, "[b]ecause [C.C.] was not afforded … an opportunity to make a statement in his own behalf before the [trial] court sentenced him, this Court is compelled to reverse the sentence and to remand this case to the

[trial] court for that court to resentence [him]." <u>Green</u>, 200 So. 3d at 679. On remand, the trial court shall hold a new sentencing hearing at which it resentences C.C. after giving him an opportunity to make a statement as required by Rule 26.9(b). Due return shall be made to this Court within 49 days of the date of this opinion, and the return to remand shall include the trial court's new sentencing order and a transcript of the new sentencing hearing.

Conclusion

C.C. has not provided this Court with any basis for reversing his convictions. Thus, those convictions are affirmed. However, we reverse C.C.'s sentences and remand the case for the trial court to hold a new sentencing hearing at which it resentences C.C. after affording him an opportunity to make a statement in accordance with Rule 26.9(b).

AFFIRMED AS TO CONVICTIONS; REVERSED AS TO SENTENCES AND REMANDED WITH INSTRUCTIONS.

Windom, P.J., and Kellum, Cole, and Minor, JJ., concur.