Rel: June 28, 2024

**Notice:** This opinion is subject to formal revision before publication in the advance sheets of **Southern Reporter**. Readers are requested to notify the **Reporter of Decisions**, Alabama Appellate Courts, 300 Dexter Avenue, Montgomery, Alabama 36104-3741 ((334) 229-0650), of any typographical or other errors, in order that corrections may be made before the opinion is published in **Southern Reporter**.

# Alabama Court of Criminal Appeals

## OCTOBER TERM, 2023-2024

_____

### CR-2022-0504

_____

### Nicholas Noelani D. Smith

### v.

### State of Alabama

### Appeal from Calhoun Circuit Court
### (CC-11-494.80)

COLE, Judge.

Nicholas Noelani D. Smith appeals the death sentence imposed on him after his second penalty-phase proceeding.

Facts and Procedural History

The facts presented in support of Smith's conviction have been summarized by this Court, in part, as follows:

"On the night of April 20, 2011, Kevin Thompson was speaking on the telephone to Chris Wilkerson, his friend, when he heard someone at his front door. Thompson opened the door. Wilkerson heard Thompson say, '"I didn't know you was bringing all these people with you."' (R. 1157.) Then, the telephone call was disconnected. Wilkerson dialed Thompson's telephone number and Thompson answered. The telephone call was brief, with Thompson telling Wilkerson that he would call him right back. A few hours passed without Thompson returning the telephone call. Worried, Wilkerson telephoned Thompson repeatedly around midnight, but Thompson did not answer.

"Thompson's absence from his position as a teacher at Wellborn Elementary School was noticed early the following morning…. Multiple individuals attempted to contact Thompson by telephone to no avail. Deputy Brendan Harris of the Calhoun County Sheriff's Office, the school's resource officer, was dispatched to an address to conduct a welfare check. The address, though, led Deputy Harris to the residence of Thompson's mother and sister, Frances and Rena Curry. Deputy Harris was able to make contact with Rena Curry and expressed to her the concern the staff at the elementary school had regarding Thompson's absence.

"Rena Curry telephoned her mother and then drove to Thompson's apartment. Two things stood out to Rena Curry upon her arrival. First, Thompson's vehicle, a silver Honda Civic, was not in the parking lot. Second, and more peculiar, was a single shoe, which she believed belonged to Thompson, lying in the parking lot. The front door to Thompson's apartment was unlocked, and Rena Curry did not notice anything amiss inside.

"Frances Curry telephoned the Jacksonville Police Department and asked that an officer meet her at Thompson's apartment. An officer responded to Thompson's apartment

2

and briefly investigated before leaving. In Frances Curry's opinion, law enforcement seemed unconcerned about Thompson's whereabouts.

"Undeterred, Frances Curry continued her search for her son. Frances Curry telephoned Thompson's bank and learned that several withdrawals had been made from Thompson's account the previous night at various financial institutions. Frances Curry again contacted the Jacksonville Police Department to inform them of the account activity.

"Officers obtained surveillance footage from the area credit unions and banks where withdrawals had been made that corresponded with the times of activity on Thompson's account. Video from the Jacksonville branch of the Farmers & Merchants Bank depicted a silver vehicle arriving at 10:19 p.m. A man wearing a baseball cap bearing a script 'A' made multiple withdrawals from the bank's automatic-teller machine ('ATM'). In an apparent attempt to obscure his identity, the man held his left arm across his face; the attempt, though, made visible a distinct tattoo on the man's left hand. The video also appeared to depict a passenger in the front seat of the vehicle aiming a rifle toward the backseat of the vehicle. Photographs from the Jacksonville branch of the Ft. McClellan Credit Union depicted what appeared to be the same man make a withdrawal from the ATM at 10:26 p.m. Photographs from the Anniston branch of the Ft. McClellan Credit Union depicted a silver vehicle and a dark-colored sport-utility vehicle arrive at 12:13 a.m. on April 21. There, a man walked up to the ATM and made a withdrawal. Officers presented photographs generated from the surveillance footage to Frances Curry and Rena Curry to see if an identification could be made. Rena Curry was able to identify Tyrone Thompson. Rena Curry explained that Tyrone Thompson was a family acquaintance whom Thompson had known since the two were children. Thompson had recently made contact with Tyrone Thompson after Tyrone Thompson's latest release from incarceration….

3

"Investigator Clint Parris of the Anniston Police Department located Tyrone Thompson, and he agreed to be interviewed. During an interview with Investigator Parris and Investigator Joseph Martin of the Jacksonville Police Department, Tyrone Thompson identified Smith as being involved with Thompson's disappearance.

"Meanwhile, Cynthia Warf, who had been visiting her husband, Andrew Jones, at the hospital, returned to her residence to find multiple individuals in her husband's garage. Warf saw Jessica Foster, her daughter; Whitney Ledlow; Smith; and two other males, who were later identified as Blake Hamilton and Teddy Lee Smith, in the garage with a silver vehicle…. Smith had telephoned Ledlow at 3:00 a.m. that morning to ask Foster if he could park his friend's vehicle at Warf's house and Foster had agreed. When Smith met with Ledlow and Foster later that morning, Smith told them he needed someone to 'chop' the vehicle. At Ledlow's request, Hamilton and Teddy Lee Smith agreed to take the vehicle apart for scrap.

"Warf, assuming that the vehicle had been stolen, told the individuals to remove the vehicle from the garage and threatened to telephone law enforcement. As she walked back to her residence, the individuals fled; Ledlow, Foster, and Smith went in search of a trailer to remove the vehicle, which by this point was not operable. Warf telephoned her husband about the silver vehicle in his garage and he telephoned law enforcement. When officers arrived at the garage, it was apparent that the silver vehicle was in the process of being dismantled. Assistant Chief Bill Wineman of the Jacksonville Police Department testified that the silver vehicle was registered to Thompson.

"Ledlow, Foster, and Smith planned to return to Warf's house, tow the vehicle away, and burn it. That plan was abandoned, though, because they saw a number of police

4

vehicles as they neared Warf's house. Smith told Ledlow and Foster that they 'were deeper in it than [they] thought,' so they drove away. (R. 849.) Ledlow and Foster decided to travel to Carrollton, Georgia, to give themselves time to consider their next step. Ledlow stated that she did not know what Smith had done to Thompson and described Smith's behavior during the trip to Carrollton as 'perfectly fine.' (R. 853.) In Carrollton, Ledlow rented a motel room for the night. There, Smith admitted to Ledlow and Foster that he had been involved in a murder with Tyrone Thompson and Jovon Dwayne Gaston. Smith detailed for them the crime and generally described the location of Thompson's body. Ledlow testified that she was initially incredulous because Smith was so calm. The three then went to a Walmart retail store to purchase clothes and toiletries. Ledlow playfully struck Smith in the arm while at the store, and Smith responded, '[D]on't you know you don't punch a killer.' (R. 857.)

"The following day, Warf contacted Investigator Parris and informed him that Smith's black Ford Explorer sport-utility vehicle was parked in a parking lot near her house. She also told Investigator Parris that Foster, Ledlow, and Smith were likely traveling in a GMC Yukon sport-utility vehicle that belonged to her son. Meanwhile, Smith was making arrangements to enter a drug-rehabilitation program in Florida. Ledlow, Foster, and Smith left the motel in Carrollton and traveled to the airport in Atlanta. On the way, Ledlow saw a number of police vehicles following them. When she parked near the taxi terminal at the airport, officers swarmed their vehicle and took the three into custody.

"A search of the Yukon yielded a camera, which Foster admitted was taken from Thompson's vehicle. Officers also found a black baseball cap with a script 'A,' which appeared to match the hat that was captured by the ATM surveillance footage. Ledlow also admitted to taking a ring from Thompson's vehicle, which she pawned for $200. Ledlow and Foster provided lengthy statements to officers following their

5

arrest, and Ledlow consented to a search of her property. Officers recovered several items of evidentiary value on Ledlow's property. From an exterior trash can, officers recovered: a pair of Nike Air Jordan basketball shoes, which had dried mud and vegetation stuck on the soles and several reddish-brown stains on the uppers; cardboard packaging for duct tape; a nearly expended roll of gray duct tape; and a t-shirt wrapped around a serrated steak knife, which appeared to bear a mixture of dried blood and mud on the blade and handle. Inside Ledlow's house, officers recovered: a pair of COOGI brand denim jeans, which bore dried mud; and a pair of boxer shorts, which bore red stains. Subsequent DNA testing established that the bloodstains found on the jeans, knife, and basketball shoes were consistent with Thompson's DNA. Smith was listed as a potential contributor for DNA found inside the basketball shoes, and DNA on the inside of the jeans was consistent with Smith's DNA.

"Officers obtained information that Thompson's body had been disposed of down an embankment near a set of guardrails on U.S. Highway 278. Based on that description, Investigator Seth Rochester of the Cherokee County Sheriff's Office was able to locate Thompson's body in the early morning hours of April 23. Thompson's wrists were bound with duct tape, and a subsequent analysis of the tape revealed that the tape was consistent with the tape found in Ledlow's trash can.

"The injuries suffered by Thompson were substantial. Dr. Emily Ward, a state medical examiner with the Alabama Department of Forensic Sciences, performed the autopsy on Thompson's body. Dr. Ward noted a cut across the front of the neck, which was deep enough to compromise the windpipe and left jugular vein. This injury caused blood to aspirate into Thompson's lungs. Thompson suffered four haphazard stab wounds to the left side of his chest -- two pierced the heart and all four pierced the left lung. Dr. Ward stated that the orientation of the wounds suggested that Thompson's

6

assailants were standing while Thompson was in a submissive position on the ground. Thompson sustained a contusion to the entire left side of his face, consistent with punching or kicking. In Dr. Ward's opinion, this injury was caused by a 'tremendous' amount of force. (R. 753.) Thompson bore superficial abrasions on his extremities, which could have been caused by falling; bruises to his wrists, which were consistent with his wrists being bound by duct tape; and defensive wounds to his palms. Dr. Ward stated that, although the stab wounds and injury to the throat were severally fatal, Thompson's death was not quick because Thompson did not sustain arterial bleeding. In Dr. Ward's opinion, Thompson would have been aware of his injuries and would have experienced significant pain.

"Shane Golden, a forensic scientist with the Alabama Department of Forensic Sciences, processed Smith's Explorer. Golden applied a luminol reagent, which reacts with iron in the hemoglobin of blood, to the interior of Smith's vehicle…. Subsequent DNA testing of blood swabs taken from Smith's Explorer revealed that the samples were consistent with Thompson's DNA.

"Golden noted a smell of cleaners in the Explorer. That odor was explained by John Robinson, who owned a detail shop. Robinson identified Smith as having come to his detail shop on the morning of April 21. Smith's visit was memorable to Robinson because Smith wanted only the interior of his vehicle cleaned and because Smith emphasized that he wanted the cleaning to be thorough. Robinson testified that he saw red spatter on the carpet in the back seat and around the console.

"Smith was extradited to Alabama on April 27. Upon his return he waived his Miranda[ v. Arizona, 384 U.S. 436 (1966),] rights and provided a statement to Investigator Parris and Investigator Martin, which gave the officers a horrifying glimpse into Thompson's final hours. Smith's

7

statement included several versions, each more incriminating than the last. Smith stated that Tyrone Thompson had telephoned him around 10:00 to 10:30 p.m. on April 20 to 'go get some money' and drink some beer. (State's Exhibit 60.) Tyrone Thompson picked up Gaston and Smith, and then the three went to Thompson's apartment. Tyrone Thompson, Gaston, and Smith walked up to the front door. Thompson met the men at the front door and Tyrone Thompson took a telephone from Thompson and smashed it. Thompson was then taken to his vehicle. Gaston retrieved his rifle and all four men entered Thompson's vehicle. Smith drove Thompson's vehicle to a bank where he withdrew funds from Thompson's account. The men returned to Thompson's apartment, at which point Thompson was forced into the trunk of his vehicle. After picking up Smith's Explorer, the men took both vehicles to Tyrone Thompson's house, where they drank beer and discussed who would kill Thompson. Following an unsuccessful search for a chop shop in Coldwater, Alabama, the men traveled to Warf's house and then to a branch of the Ft. McClellan Credit Union. Thompson's debit card did not work at the credit union, so the men returned to Warf's house. After a brief trip to a Shell gasoline station to purchase duct tape, the men returned to Warf's house and used the tape to bind Thompson. Thompson, though, had broken some of his bindings and was screaming in the trunk, so he was moved to Smith's Explorer. The men traveled to Piedmont, Alabama, and found an isolated stretch of Highway 278. Thompson was escorted off the road. Tyrone Thompson handed Smith a knife and held Thompson's hands while Smith slit Thompson's throat. Thompson, who was crying and pleading for help at this point, was held down as a vehicle passed. Then Gaston took the knife from Smith and stabbed Thompson several times in the chest. Thompson was held down as another vehicle passed, and then was held up and again stabbed by Gaston. After pushing Thompson to the bottom of the embankment, Smith, Tyrone Thompson, and Gaston left the scene.

"In his statement, Smith attempted to marginalize his role by suggesting that he unwittingly had become involved in Thompson's murder and that he had been a reluctant participant. This suggestion, however, was rebutted by other evidence offered at trial."

Smith v. State, 246 So. 3d 1086, 1090-94 (Ala. Crim. App. 2017) (footnotes omitted).

Smith was convicted of two counts of capital murder -- one count for intentionally killing Kevin Thompson during a kidnapping, a violation of § 13A-5-40(a)(1), Ala. Code 1975, and one count for intentionally killing Thompson during a robbery, a violation of § 13A-5-40(a)(2), Ala. Code 1975. The jury, by a vote of 11 to 1, recommended that Smith be sentenced to death. The Calhoun Circuit Court ("the trial court") followed that recommendation. Smith appealed.

On March 17, 2017, this Court issued an opinion affirming Smith's capital-murder convictions, but we remanded Smith's case to the trial court for that court to conduct a new penalty-phase proceeding.[1] Id. This Court found plain error during the penalty phase of Smith's trial when the trial court allowed "the State to elicit and argue the opinions of

_____

[1]The Alabama Supreme Court denied certiorari review on August 25, 2017, and this Court issued a certificate of judgment that same day, which returned jurisdiction over Smith's case to the trial court. (C. 89.)

9

Thompson's family to persuade the jury to recommend a sentence of death." Smith, 246 So. 3d at 1114.

On remand, the trial court followed this Court's instructions and conducted a second penalty-phase proceeding. During the second penalty-phase proceeding, the State presented its evidence of aggravating circumstances to the jury, and Smith presented his mitigating circumstances. Specifically, Smith called Colby Kalani, Elaine Young, Dr. Henry Griffith, and Joanne Terrell (his mitigation specialist), and had the prior testimony of Smith's mother, Chrisandra Smith, read to the jury.

Kalani, who is Smith's half-brother and who is 10 years older than Smith, testified about them growing up in Hawaii and their "chaotic" home life, which he described as more chaotic than being in a prison. (R. 584, 593.) Kalani said that there was no structure and that, when he was 10 years old, he would be left to watch Smith. (R. 586.) Kalani also said that their mother was "extremely violent," and had stabbed both him and Smith and had run over him with her car. (R. 588.) Kalani explained that their mother "could also be the sweetest too though." (R. 592.) Kalani admitted that he had physically and sexually abused Smith. (R.

10

595.) As the trial court's sentencing order explained, Smith's mother's testimony also outlined "the physical, mental, emotional abuse that was persistent throughout Mr. Smith's life. Testimony of Elaine Young, Children's advocacy Center Director, discussed the nature of his abuse and the failure of the system to adequately protect Mr. Smith as a child." (C. 238.)

At the conclusion of Smith's second penalty-phase proceeding, the jury, in addition to the two aggravating factors proved beyond a reasonable doubt at Smith's guilt-phase proceeding (i.e., that the capital offense was committed during the course of a first-degree kidnapping and that the capital offense was committed during the course of a first-degree robbery), found that three other aggravating circumstances were proved beyond a reasonable doubt -- namely, that Smith committed the capital offenses after having been previously convicted of a felony involving the use or threat of violence to a person, that Smith committed the capital offenses while under a sentence of imprisonment, and that the capital offense was especially heinous, atrocious, or cruel when compared to other capital offenses. (C. 222-24.) In all, the jury found five aggravating circumstances to exist beyond a reasonable doubt. The jury then

recommended by a vote of 10 to 2 that Smith be sentenced to death. (C. 225.) The trial court, finding that "the aggravating circumstances outweigh the mitigating circumstances,"[2] followed the jury's recommendation and sentenced Smith to death. (C. 236-38; R. 781-83.) This appeal follows.

## Standard of Review

Rule 45A, Ala. R. App. P., currently provides that,

> "[i]n all cases in which the death penalty has been imposed, the Court of Criminal Appeals may, but shall not be obligated to, notice any plain error or defect in the proceedings under review, whether or not brought to the attention of the trial court, and take appropriate appellate action by reason thereof, whenever such error has or probably has adversely affected the substantial right of the appellant."

Before the current version of Rule 45A, the rules of preservation did not apply in cases in which the death penalty had been imposed, and this Court had to review the entire record for plain error. Although no longer required, this Court recently explained that it would continue to review the entire record for plain error in all cases in which the death penalty

---

[2]The trial court did not find any additional aggravating circumstances to exist. (C. 237.)

12

has been imposed. See Iervolino v. State, [Ms. CR-21-0283, August 18, 2023] ___ So. 3d ___, ___ (Ala. Crim. App. 2023).

Because this Court already conducted plain-error review of Smith's guilt-phase proceeding and affirmed his convictions for capital murder, our plain-error review in this case is limited to Smith's second penalty-phase proceeding. See Jerry Jerome Smith v. State, [Ms. CR-17-1014, Sept. 2, 2022] ___ So. 3d ___, ___ n. 2 (Ala. Crim. App. 2022) ("This Court has already affirmed Smith's capital-murder conviction; thus, it has already reviewed the guilt phase of Smith's trial for plain error. Consequently, we do not review for plain error anything that occurred during the guilt phase of his trial. Instead, our plain-error review is limited to Smith's sixth penalty-phase proceeding.").

In conducting plain-error review of Smith's second penalty-phase proceeding, we apply the following standard:

> " 'The standard of review in reviewing a claim under the plain-error doctrine is stricter than the standard used in reviewing an issue that was properly raised in the trial court or on appeal.' Hall v. State, 820 So. 2d 113, 121 (Ala. Crim. App. 1999), aff'd, 820 So. 2d 152 (Ala. 2001). Plain error is 'error that is so obvious that the failure to notice it would seriously affect the fairness or integrity of the judicial proceedings.' Ex parte Trawick, 698 So. 2d 162, 167 (Ala. 1997), modified on other grounds, Ex parte Wood, 715 So. 2d 819 (Ala. 1998). 'To rise to the level of plain error, the claimed

13

error must not only seriously affect a defendant's "substantial rights," but it must also have an unfair prejudicial impact on the jury's deliberations.' Hyde v. State, 778 So. 2d 199, 209 (Ala. Crim. App. 1998), aff'd, 778 So. 2d 237 (Ala. 2000). 'The plain error standard applies only where a particularly egregious error occurred at trial and that error has or probably has substantially prejudiced the defendant.' Ex parte Trawick, 698 So. 2d at 167. '[P]lain error must be obvious on the face of the record. A silent record, that is a record that on its face contains no evidence to support the alleged error, does not establish an obvious error.' Ex parte Walker, 972 So. 2d 737, 753 (Ala. 2007). Thus, '[u]nder the plain-error standard, the appellant must establish that an obvious, indisputable error occurred, and he must establish that the error adversely affected the outcome of the trial.' Wilson v. State, 142 So. 3d 732, 751 (Ala. Crim. App. 2010). '[T]he plain error exception to the contemporaneous-objection rule is to be "used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result."' United States v. Young, 470 U.S. 1, 15, 105 S. Ct. 1038, 84 L. Ed. 2d 1 (1985) (quoting United States v. Frady, 456 U.S. 152, 163 n.14, 102 S. Ct. 1584, 71 L. Ed. 2d 816 (1982))."

DeBlase v. State, 294 So. 3d 154, 182-83 (Ala. Crim. App. 2018).

### Discussion

### I.

Smith first argues that the circuit court erred when it admitted, during Smith's second penalty-phase proceeding, "numerous photographs of Kevin Thompson's body at the crime scene, as well as graphic photographs taken at Mr. Thompson's autopsy." (Smith's brief, p. 11.) Because Smith did not object to the State's presenting these

14

complained-of photographs to the jury during Smith's second penalty-phase proceeding, this Court reviews Smith's argument for plain error only. See Rule 45A, Ala. R. App. P. We find no error, plain or otherwise, in the admission of the complained-of photographs.

Indeed, Smith raised a similar argument in his original direct appeal to this Court, which this Court also reviewed for plain error, claiming that the admission of crime-scene and autopsy photographs at the guilt phase of his trial was error because the photographs were "irrelevant, cumulative, and highly prejudicial." Smith, 246 So. 3d at 1110. This Court explained:

> "'"Generally, photographs are admissible into evidence in a criminal prosecution 'if they tend to prove or disprove some disputed or material issue, to illustrate or elucidate some other relevant fact or evidence, or to corroborate or disprove some other evidence offered or to be offered, and their admission is within the sound discretion of the trial judge.'" Bankhead v. State, 585 So. 2d 97, 109 (Ala. Crim. App. 1989), remanded on other grounds, 585 So. 2d 112 (Ala. 1991), aff'd on return to remand, 625 So. 2d 1141 (Ala. Crim. App. 1992), rev'd, 625 So. 2d 1146 (Ala. 1993), quoting Magwood v. State, 494 So. 2d 124, 141 (Ala. Crim. App. 1985), aff'd, 494 So. 2d 154 (Ala. 1986). "Photographic exhibits are admissible even though they may be cumulative, demonstrative of undisputed facts, or gruesome." Williams v. State, 506 So. 2d 368, 371 (Ala. Crim. App. 1986) (citations omitted). In addition, "photographic evidence, if relevant, is admissible even if it has a tendency to inflame the minds of the jurors." Ex parte Siebert, 555 So. 2d 780, 784 (Ala. 1989).

15

"This court has held that autopsy photographs, although gruesome, are admissible to show the extent of a victim's injuries." Ferguson v. State, 814 So. 2d 925, 944 (Ala. Crim. App. 2000), aff'd, 814 So. 2d 970 (Ala. 2001). "'[A]utopsy photographs depicting the character and location of wounds on a victim's body are admissible even if they are gruesome, cumulative, or relate to an undisputed matter.'" Jackson v. State, 791 So. 2d 979, 1016 (Ala. Crim. App. 2000), quoting Perkins v. State, 808 So. 2d 1041, 1108 (Ala. Crim. App. 1999), aff'd, 808 So. 2d 1143 (Ala. 2001), judgment vacated on other grounds, 536 U.S. 953 (2002), on remand to, 851 So. 2d 453 (Ala. 2002).'"

Smith v. State, 246 So. 3d 1086, 1111 (Ala. Crim. App. 2017) (quoting

Brooks v. State, 973 So. 2d 380, 393 (Ala. Crim. App. 2007)). This Court

rejected Smith's argument in his direct appeal, holding:

"The photographs were relevant and admissible to establish the injuries Thompson sustained. See Gobble v. State, 104 So. 3d 920, 963-64 (Ala. Crim. App. 2010) (holding that autopsy photographs were gruesome yet necessary to demonstrate to the jury the extent of the victim's injuries (quoting Dabbs v. State, 518 So. 2d 825, 829 (Ala. Crim. App. 1987))). 'The photographs and testimony relating to postmortem animal and insect activity were also relevant and admissible to distinguish between the injuries [Smith] caused and the injuries that he did not.' Kelley v. State, 246 So. 3d 1032, 1051 (Ala. Crim. App. 2014), rev'd in part on unrelated grounds by Ex parte Kelley, 246 So. 3d 1068 (Ala. 2015). Although unpleasant, the photographs and testimony were not unduly gruesome or unfairly prejudicial. Consequently, this Court holds that the prejudicial effect of the evidence was not substantially outweighed by its prejudicial effect. Id.; see also Rule 403, Ala. R. Evid. ('Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice.')."

16

Smith, 246 So. 3d at 1111.

The only difference between Smith's argument on direct appeal and his present argument is the proceeding at which the complained-of photographs were admitted. The State merely reintroduced during the second penalty-phase proceeding the same complained-of photographs that were admitted during Smith's guilt-phase proceeding. Regarding the admission of evidence at a penalty-phase proceeding, § 13A-5-45(c), Ala. Code 1975, provides that

> "evidence may be presented as to any matter that the court deems relevant to sentence and shall include any matters relating to the aggravating and mitigating circumstances referred to in Sections 13A-5-49, 13A-5-51, and 13A-5-52. Evidence presented at the trial of the case may be considered insofar as it is relevant to the aggravating and mitigating circumstances without the necessity of re-introducing that evidence at the sentence hearing, unless the sentence hearing is conducted before a trial judge other than the one before whom the defendant was tried or a jury other than the trial jury before which the defendant was tried."

In other words, because the State presented these complained-of photographs during the guilt phase of Smith's trial, the State could re-introduce the photographs to his new penalty-phase jury as long as the photographs were "relevant to the aggravating and mitigating circumstances."

17

This Court, as it did in Smith's previous appeal, has again reviewed the complained-of photographs, and to be sure, some of the photographs are graphic and unpleasant. But the photographs show the extent of the brutal injuries that Thompson sustained when Smith and his colleagues murdered Thompson. The complained-of photographs are also probative of the aggravating circumstance that the offense was especially heinous, atrocious, or cruel when compared to other capital offenses when they are considered in conjunction with Dr. Emily Ward's testimony about the extent of Thompson's injuries and what he would have experienced as he was being murdered, and her testimony that Thompson would not have died quickly. Thus, the photographs were relevant to the State's proving the aggravating circumstance that the capital offense was especially heinous, atrocious, or cruel when compared to other capital offenses, and, thus, were properly admitted. See Haney v. State, 603 So. 2d 368, 396 (Ala. Crim. App. 1991) ("The photographs depict the location of the crimes, the manner in which it was carried out, and its viciousness, all of which were highly relevant to the issues in the case. Moreover, the photographs were relevant to corroborate or disprove other evidence in the case. They were probative in proving the aggravating circumstance

18

that the crimes were committed in an especially heinous, atrocious, or cruel manner as compared to other capital offenses.").

Accordingly, Smith is due no relief on this claim.

## II.

Next, Smith argues that the trial court erred "when it allowed the State to introduce non-statutory aggravating factors to the jury through its cross-examination of [his] psychological expert, Dr. Henry Griffith, on subjects that exceeded the scope of any relevant issue in this case." (Smith's brief, p. 17.) Smith also argues that the trial court "erred by failing to instruct the jury not to consider [his] IQ of 128 or the absence of evidence that [he] was 'clinically insane' in reaching their sentence." (Smith's brief, p. 21.) But Smith neither objected to the State's questions posed to Dr. Griffith nor to the trial court's "failure to instruct" the jury about his IQ or lack of evidence of him being "clinically insane." Thus, Smith's arguments are reviewed for plain error only. After reviewing the record and the arguments presented by Smith and the State, we hold that there was no plain error either in the State's cross-examination of Dr. Griffith or in the trial court's failing to sua sponte instruct the jury not to

consider Smith's IQ or the absence of evidence that he was "clinically insane."

Accordingly, Smith is due no relief on these claims.

III.

Smith argues that the trial court erred when it denied his motion to continue his penalty-phase trial from March 14, 2022, "until a date early in May" because, he says, "COVID-19 and related restrictions had impeded the defense's ability to prepare its mitigation case in advance of [his] sentencing." (Smith's brief, p. 23.)

It is well settled that

> "'"'[a] motion for a continuance is addressed to the discretion of the court and the court's ruling on it will not be disturbed unless there is an abuse of discretion. Fletcher v. State, 291 Ala. 67, 277 So. 2d 882 (1973). If the following principles are satisfied, a trial court should grant a motion for continuance on the ground that a witness or evidence is absent: (1) the expected evidence must be material and competent; (2) there must be a probability that the evidence will be forthcoming if the case is continued; and (3) the moving party must have exercised due diligence to secure the evidence. Knowles v. Blue, 209 Ala. 27, 32, 95 So. 481, 485-86 (1923).'"

20

"'Fortenberry v. State, 545 So. 2d 129, 138 (Ala. Crim. App. 1988).'

"Ex parte Clark, 728 So. 2d 1126, 1134 (Ala. 1998) (quoting Ex parte Saranthus, 501 So. 2d 1256, 1257 (Ala. 1986)).  See also Scott v. State, 937 So. 2d 1065, 1076 (Ala. Crim. App. 2005)."

Eatmon v. State, 992 So. 2d 64, 68 (Ala. Crim. App. 2007).  "'"There are no mechanical tests for deciding when a denial of a continuance is so arbitrary as to violate due process"'"; rather, "'"[t]he answer must be found in the circumstances present in every case, particularly in the reasons presented to the trial judge at the time the request is denied."'" Id. at 68 (quoting Glass v. State, 557 So. 2d 845, 848 (Ala. Crim. App. 1990), quoting in turn Ungar v. Sarafite, 376 U.S. 575, 589, 84 S. Ct. 841, 850, 11 L. Ed. 2d 921 (1964)).

Moreover, reversing a death sentence because a trial court denied a motion to continue "'"requires 'a positive demonstration of abuse of judicial discretion.'  Clayton v. State, 45 Ala. App. 127, 129, 226 So. 2d 671, 672 (1969)."  Beauregard v. State, 372 So. 2d 37, 43 (Ala. Cr. App.), cert. denied, 372 So. 2d 44 (Ala.1979).'"  Eatmon, 992 So. 2d at 68 (quoting McGlown v. State, 598 So. 2d 1027, 1029 (Ala. Crim. App. 1992)).  And "'"[n]ormally, a reviewing court determines the correctness of a trial

21

court's ruling 'as of the time when it was made and according to what the record shows was before the lower court at that time.'" Henry v. State, 468 So. 2d 896, 899 (Ala. Cr. App. 1984), cert. denied, 468 So. 2d 902 (Ala. 1985).'" Eatmon, 992 So. 2d at 68 (quoting Dozier v. State, 630 So. 2d 137, 140 (Ala. Crim. App. 1993)).

On appeal, Smith argues that the trial court erred when it denied his motion to continue for two reasons: (1) his "trial counsel's ability to develop [his] mitigation case and prepare for his sentencing was inhibited by their inadequate access to [him] and Mr. Kalani as a result of COVID-19 and related restrictions" (Smith's brief, p. 25); and (2) "the short continuance requested by [him] was necessary to permit [his] mitigation specialist, Joanne Terrell, sufficient time to complete her investigation and assessment, which had been impeded by COVID and her need to limit exposure to COVID in order to protect her hospitalized husband" (Smith's brief, p. 26). Smith's arguments are without merit.

To provide context to Smith's motion to continue his second-penalty phase proceeding, we first set out some additional procedural history to this case: Smith was arrested for murdering Thompson in April 2011, and he was indicted for capital murder in May 2011. Smith was subsequently

convicted of capital murder and sentenced to death. Smith's sentences of death, however, were reversed on March 17, 2017, Smith v. State, 246 So. 3d 1086 (Ala. Crim. App. 2017), and this Court issued a certificate of judgment on August 25, 2017, returning jurisdiction of Smith's case to the trial court for that court to conduct a second penalty-phase proceeding. (C. 89.) Over two years later, on September 25, 2019, Smith filed a "Motion for Expenses to Hire a Mitigation Expert," in which he asked the trial court to give him $15,000 "to obtain the services of Joanne Terrell." (C. 194.) The next day, the trial court granted Smith's motion. (C. 91.)

Smith's second penalty-phase proceeding was set for trial on March 14, 2022. A little over three weeks before his trial was set to begin, Smith moved to continue his trial, apparently setting out "five reasons that the motion to continue should be granted."[3] (R. 17.) On February 14, 2022,

---

[3]Although Smith's counsel and the trial court referenced the motion to continue at the hearing on the motion (see R. 17), the motion does not appear in the record on appeal. "'[I]t is the appellant's duty to provide this Court with a complete record on appeal.'" Belcher v. State, 341 So. 3d 237, 264 n.9 (Ala. Crim. App. 2020) (quoting Knight v. State, 621 So. 2d 394, 395 (Ala. Crim. App. 1993)).

the trial court set Smith's motion to continue for a hearing on February 16, 2022. (C. 201.)

At the outset of the hearing on his motion, the circuit court informed the parties that it was granting Smith's motion to have Colby Kalani, who was an inmate in the Alabama Department of Corrections, "made available to counsel for the defendant in this matter." (R. 14.) The court then told Smith's counsel that it was further ordering that Kalani be put in the Cleburne County jail and that "it may be easier to get in and out of there." (R. 15.) The court told Smith's counsel that it had already "called the Sheriff to give him a heads up … [a]nd [the circuit court] told him to make him available to y'all who need to talk to him." (R. 15.) Smith's counsel then told the circuit court that they had not been able to have in-person contact with Smith "in two years" and that they wanted to be in the room with him. (R. 16.) The circuit court told Smith's counsel, "We can make that happen. That's not a big deal. That's easy. They may have to disinfect and spray stuff. I don't know what their COVID protocol is down there. I mean, they'll take care of whatever it is." (R. 16-17.)

Smith's counsel then addressed the motion to continue, and counsel explained that the current "COVID spike" was "the largest COVID spike in two years." (R. 17.) Smith's counsel noted to the court that "this is the first time the defense team has met in entirety with Mr. Smith." (R. 18.) Smith's counsel further argued that, because of this rise in COVID-19 cases, Smith's trial should be postponed for a short time due to his concern that black jurors "will not be well-represented." (R. 21.) Specifically, Smith's counsel said that Smith's trial is

> "set for 23 days from today. And we'll be picking a jury. We've been close before, 30 days out in September of 2019, before Judge Howell called an index. This -- and I wanted to preserve for the record if the judge doesn't grant this motion for a continuance and you sentence Mr. Smith to death I believe there's an inaccessibility to client followed by -- which could lead to ineffective assistance of counsel, which I'll admit to not being able to get my team in to see Mr. Smith.
>
> "I didn't get an infectious disease specialist or epidemiologist in here. We're going to be in close quarters with -- and I have talked to Kim McCarson, and I may have played a hand. I asked her about how many people will be summoned for jury duty. And I have attempted to watch two jury trials, murder trials. I was escorted out of one under the guise of COVID.
>
> "....
>
> "Not you, Judge. In another circuit. And in the previous -- in the other case, it was a murder case, there were 14 white jurors seated and it ended up in mistrial. It was an abortion.

It was in Judge Jones' class or courtroom in December, I believe. There's going to be a dearth of -- I won't know for 23 days. We expect a dearth of black jurors from the pool. The population here is 23 percent black, and we won't know until that date whether to move for striking or doing away with the impaneling of the jury. But that's what we expect is that blacks in particular will not be well-represented in this particular trial, and we would ask for some time to let COVID lapse. Maybe this summer. Maybe May. But those are about all of the items I wanted to put on the record."

(R. 20-21.)

The State responded to Smith's argument and maintained that it was ready to proceed to trial and argued that there should not be any concern about accessibility to inmates, explaining:

"[A]s far as access to inmates, there have been numerous things done by the Department of Corrections to make their inmates accessible. They've done Zoom [video conferences]. We've had hearings where defendants have been made available through Zoom. In particular this defendant's codefendant has been made available through Zoom in a hearing that we have had regarding his counsel. That would be Mr. Jovon Gaston, Your Honor. So there are ways to visit with capital murder defendants. It can be done through Zoom.

"I was present when the request was made to have Mr. Smith brought up from Department of Corrections to make him available for Dr. Griffith for him to be able to interview him. That was done for defense counsel at their request. The Court has made him available to them."

(R. 22-23.) As far as Smith's argument about whether black jurors would be underrepresented, the State argued:

> "And as relating to potential jurors or lack of or discrepancy in number, Your Honor, those things are not ripe until we get ready for trial. That's a chance we take every time we move to try a case even pre-pandemic. Our sister county when we go to strike juries over there the numbers are not always what you would hope they would be, but that is representative of that county. Our numbers here represent this county.
>
> "So it is not an issue that becomes ripe until we try to select that jury. And if at the time we're not able to get one and the Court believes that it can't be done, then measures will be taken. But as far as I'm concerned, Your Honor, we're ready to move forward and have been for quite some time."

(R. 24-25.)

Thereafter, Smith's counsel added a new reason why the trial court should grant his motion to continue -- namely, Smith's mitigation expert, Joanne Terrell, "has expressed concerns regarding COVID." (R. 26.) Smith's counsel argued:

> "[A]nother concern that we've got which I think may or may not have been laid out in the motion is our mitigation specialist, Joanne Terrell, has expressed concerns regarding COVID. Her husband is currently hospitalized. I believe he's got heart and lung conditions. So she's trying to be extremely cautious about not exposing him to COVID. And that caution has made it more difficult for her to do her job as well. Her job is not one that can really be done over Zoom or be done in any way other than meeting with people in person. So we

27

have to make her concerns known as well because even though she's just one member of this team she's arguably the most important one. I would almost rather -- and I think [co-counsel] would agree with me -- I would almost rather lose a lawyer from this team than to lose her. Without her there's not much we can do. So her concerns have to be taken into account as well, Judge."

(R. 25-26.) The State countered that "[w]e all have family" that we do not want to expose to COVID-19, but "I anticipate being here March 14th and everyone else should be as well." (R. 28.) The State also argued that its

"understanding is Ms. Terrell has already generated a report and her findings as relating to her encounters with Mr. Smith and probably any of the other persons that she's also spoken with. So I would ask the Court to have the defense produce that report to the Court as well as any timeline or anything that may be available and that -- I mean, she has -- we all have health concerns, Your Honor."

(R. 27.) Smith's counsel then told the trial court that Terrell's "job doesn't stop once she generates that report," and that she "still does work up to and throughout the trial." (R. 28.) Thereafter, the trial court found as follows: "All right. The Court has considered the motion to continue and arguments of counsel on behalf of the defendant in this case [by both defense counsel] and corresponding response by the State of Alabama in this case. Motion to continue will be denied." (R. 30-31.) On February 17, 2022, the trial court memorialized its denial of Smith's motion to

continue in a written order. (C. 204.) A few days later, on February 24, 2022, Smith asked the trial court for an additional $15,000 to pay Joanne Terrell. (C. 208-10.) The trial court granted Smith's motion. (C. 211.) The jury-selection process for Smith's second penalty-phase proceeding began on March 10, 2022, and, as set out above, both Colby Kalani and Joanne Terrell testified in Smith's mitigation case.

On appeal, Smith maintains that the circuit court erred when it denied his motion to continue his second penalty-phase proceeding because, he says, the circuit court "ignored compelling reasons to grant Mr. Smith's motion for a continuance." (Smith's brief, p. 24.) Smith highlights two "compelling reasons" for granting his motion.

First, Smith says that his motion to continue should have been granted because his "trial counsel's ability to develop [his] mitigation case and prepare for his sentencing was inhibited by their inadequate access to Mr. Smith and Mr. Kalani as a result of COVID-19 and related restrictions." (Smith's brief, p. 25.) Second, Smith says that "the short continuance requested by [him] was necessary to permit [his] mitigation specialist, Joanne Terrell, sufficient time to complete her investigation and assessment, which had been impeded by COVID and her need to

limit exposure to COVID in order to protect her hospitalized husband." (Smith's brief, p. 26.) Neither reason shows that the circuit court abused its considerable discretion here when it denied Smith's motion to continue.

As set out above, Smith was arrested for capital murder in 2011, he was convicted of capital murder and sentenced to death the first time in 2013, his death sentence was reversed on March 17, 2017, and this Court issued a certificate of judgment on August 25, 2017, which returned jurisdiction of Smith's case to the circuit court for that court to conduct a second penalty-phase proceeding. Smith did not move for a continuance of his second penalty-phase proceeding until February 2022. Although Smith's counsel mentioned difficulties with accessing Kalani and Smith because of COVID-19-related issues and noted Terrell's concerns about COVID-19, Smith's counsel did not explain why he could not have accessed Kalani and Smith and why a mitigation expert could not have completed a mitigating investigation in the nearly three years between this Court's returning jurisdiction to the circuit court for Smith's second penalty-phase proceeding and the start of the COVID-19 pandemic in March 2020.

What is more, as to Smith's argument on appeal about having access to Kalani and Smith, the circuit court made it clear to Smith's counsel at the hearing on his motion to continue that Smith's counsel would not have an issue accessing Kalani and could have in-person contact with Smith. Smith's counsel expressed no disagreement or concern with the court's assurance of access to Kalani and Smith, and Smith's counsel expressed no further concerns about accessing either Smith or Kalani and made no further argument about needing a continuance based on their access to Smith. As to Smith's argument about Terrell's mitigation investigation, the State correctly points out that Terrell "had already generated a report on January 30, 2022 with her findings regarding Smith." (State's brief, p. 18.) Although Smith's counsel explained that Terrell's mitigation investigation was on-going, Smith's counsel did not explain to the circuit court what additional mitigation evidence Terrell was hoping to uncover in the event the court granted his motion. Although Terrell expressed a concern about testifying at trial due to a rise in COVID-19 cases because a family member had been hospitalized, Terrell did testify and her hesitancy to testify at trial did not require the circuit court to grant Smith's motion to

continue. Her hesitancy certainly does not establish that the court abused its discretion in denying Smith's motion to continue.

In short, the circuit court did not abuse its considerable discretion when it denied Smith's motion to continue his second penalty-phase proceeding.

Accordingly, Smith is due no relief on this claim.

IV.

Smith argues that the trial court erred when it denied his motion to have the entire Calhoun County District Attorney's Office recused from his case. (Smith's brief, p. 29.) According to Smith, after his first trial, the "lead counsel [from] his first trial (Timothy Burgess) joined the Calhoun County District Attorney's office." (Smith's brief, p. 29.) In his brief on appeal, Smith explains:

> "Mr. Burgess was Mr. Smith's lead counsel in the guilt and penalty phases of his initial trial in 2013. During the course of his representation of Mr. Smith, from 2011 through 2013, Mr. Burgess acquired confidential information relating to Mr. Smith's case. Most notably, as the attorney who examined the majority of Mr. Smith's witnesses at his first trial and during his first sentencing -- including Mr. Smith's mitigation expert --and delivered the penalty-phase closing statement on behalf of Mr. Smith, Mr. Burgess acquired confidential information regarding Mr. Smith's mitigation evidence, which was the subject of his re-sentencing. Following that first trial, Mr. Burgess became an Assistant

32

District Attorney with the Calhoun County District Attorney's office in 2015, and served in that capacity until 2021, at which point he became a circuit court judge in Calhoun and Cleburne Counties. Mr. Burgess' work at the Calhoun County District Attorney's office presented a conflict of interest that should have precluded the Calhoun County District Attorney's office from prosecuting Mr. Smith in his re-sentencing proceeding. At a minimum, the trial court should have conducted an inquiry into the existence of a conflict."

(Smith's brief, pp. 29-30.) Smith raises two arguments on appeal concerning the trial court's denial of his motion to have the entire district attorney's office recused from his case. Neither argument entitles him to any relief.

Before we address Smith's arguments, we must provide context to Smith's argument by setting out the procedural history surrounding his motion to recuse: On January 30, 2020, Smith moved the trial court to recuse the entire district attorney's office from his second penalty-phase proceeding because Burgess had been hired to work in that office. Smith alleged that "it <u>could</u> appear the members of the District Attorney's Office have acquired such information and thereby such an interest in this case that they shall not be able to discharge their duties impartially in regard to this case." (C. 191 (emphasis added).)

33

The next day, the State responded to Smith's motion. The State alleged that, "[s]ince his hire, Tim Burgess has been advised to avoid working on cases that involve any potential conflicts with prior cases, and has been advised not to discuss with any member of this Office any information that he may have derived from prior cases." (C. 189.) The State further explained that, with Burgess, it had followed the National District Attorney's Association's guidelines for addressing potential conflicts of interest within the office by "firewalling" him from the case. The State said that it believed that recusal was not necessary in this case because "there are adequate firewalls in place to protect this Office and the Defendant from any disclosure of information that would be detrimental to either party." (C. 190.)

On February 7, 2020, the trial court issued an order denying Smith's motion to recuse, finding that it "is satisfied with the response of the State of Alabama and that appropriate steps have been taken in compliance with the 'best practices' to prevent conflicts from arising." (C. 186.)

On February 28, 2020, Smith filed a "Request for Evidentiary Hearing Date," in which Smith asked the circuit court to conduct a

hearing to determine whether there existed "a direct or imputed conflict with the Calhoun County District Attorney's Office prosecution of Smith." (C. 105.) The trial court granted Smith's request for an evidentiary hearing on his motion to recuse. (C. 115.) Later, the trial court set the hearing on Smith's motion for January 8, 2021. (C. 159.)

At the hearing, Smith's counsel argued that, despite the State's assertion that it had taken measures to ensure that Burgess did not discuss or work on Smith's case, the appearance of impropriety was enough to require the entire office to recuse. Smith's counsel conceded that he was "not saying that there's any nefarious action by [the district attorney] or by Mr. Burgess or that there's some sort of underhanded thing going on." (Supp. R. 6.) Smith's counsel argued:

> "Now, I understand what the rules of professional conduct say about moving from private work to government work, and I understand that it doesn't say that every conflict is automatically -- you wouldn't want the DA's office to be prevented from hiring quality prosecutors. I get that. That makes total sense. If I were Mr. McVeigh, [the district attorney,] I would say, wow, this guy is a great lawyer, he tries a good case, I want to hire him. We wouldn't want to discourage that. But asking them to recuse off of one specific case where the man has been sentenced to death already and by their own admission, there's a transcript, the evidence is going to be the same, there's nothing to worry about. Okay. Well, then there's no problem.

35

"Out of an abundance of caution it's not like we're asking to try the case again. We're not asking to introduce new evidence. The evidence is closed, so the only thing that we're doing is presenting a different strategy at sentencing, one which they may very well be aware of by virtue of the fact that his trial counsel had 1,200 days in their office before he even needed to be screened off of anything. Okay? That's it."

(Supp. R. 9-10.)

The district attorney responded by explaining the office procedures that are in place when the district attorney -- both past and present -- has hired an attorney who has previously tried criminal defense cases as follows:

"[W]hen we have the ability to hire people -- I have hired some new lawyers that don't have any experience, but most of my hires for people who are going to be trying cases have been experienced criminal lawyers. They're going to have to, in a small county like this, have tried cases before, and Mr. Johnston and Mr. Burgess specifically have tried capital cases. I would say the bulk of capital cases.

"So when you're talking about recusing -- and he's right. The easiest thing in the world for me to do would be to come in here and say, no, let somebody else have it, and that's going to affect every capital case that I have that those two men touched. And that goes back to when Joe Hubbard was the district attorney and Tim Burgess was trial counsel for Ellis Mashburn.

"So the idea that when somebody comes in because a capital murder case is on appeal, then, well, we don't need to screen people. We say if you have tried a capital murder under Joe Hubbard and you're hired in this office, you never

talk about that case, we never ask you any questions, you never disclose anything to us. You don't look anything up on the computer. Those are the rules.

"That's what has been the case since Mr. Field was the DA. It was the case when Joe Hubbard was the DA. It's the case under me. So to say that there was 1,000-some odd days when he wasn't screened is false on its face. From the moment he was hired in this office, he was screened from any case he's handled in the past."

(Supp. R. 10-12.) The district attorney continued:

"If we were to say any time we hire an experienced lawyer that that lawyer is somehow conflicted on all cases involving all people in our county of 120,000 people, we wouldn't try very much of anything. We would conflict it all the time, especially on capital cases, so your choice would be don't hire the experienced lawyers that have criminal history. I was a three-year-experienced criminal defense lawyer when I was hired, and I had some cases that I tried on the other side. You know, there are potential issues there. That's why the firewall is put into place.

"I don't think we're required to step away from a case just because the allegation is made. I understand why the allegation is made. It's because of what I did in the other case. I would do that again. It has created some issues for me, which again is not just wiping it away. The easiest thing to do is say take me off of every capital case. I'm not doing that.

"I'm saying our office is shielded. I'm saying this defendant in this particular set of facts has been tried three times. Obviously it's been different in each case. There may be witnesses related to one defendant that aren't with another. This case has been tried to a verdict. What we're talking about coming back for is sentencing, so all the evidence will come in through a couple of witnesses. It will be

37

a truncated trial. The majority of stuff being done will be done by them, and we will argue the same thing.

"I wouldn't be here if I wasn't asking for death. If I didn't want death, I could say, we'll ask for life without and just not try the case, and I believe that would [be] his sentence. So the family is asking us to ask for death. We're asking for death.

"But this Court has seen the trial. They've got transcripts of the other trial. If all the sudden I started coming out with evidence and saying, well, what about this or what about that, they wouldn't know that and could say how would he have known this. So there are mechanisms there to protect this young man who is being charged and who has been tried and who has been convicted.

"The question is his sentence. It's either death or life without. I believe that we can abide by all the rules that govern our conduct, and I believe that we have. And I believe it would be wrong to punish me for doing the right thing on another case, to then take me off of this and I would say any and all capital cases that Burgess or David Johnston or who knows who else that I have employed that has touched anybody else out there. It will have a domino effect on other cases.

"....

"So I would argue that everything he alleged was wrong. We ought to be allowed to stay on the case, but as in every case, the Court is here to monitor our behavior and to control if we stray. Okay. Thank you."

(Supp. R. 16-18.)

On May 18, 2021, after the original trial judge retired, the trial court set Smith's motion to recuse for another hearing on June 22, 2021. (C. 166.) At that hearing, the trial court and the parties agreed that the new trial judge would review the transcript from the January 8, 2021, hearing and the parties agreed that "there are no additions or supplements that should be made to that argument." (R. 4.) On August 31, 2021, the trial court issued an order denying Smith's motion to recuse. (C. 173.)

As set out above, Smith raises two arguments on appeal about the trial court's denial of his motion to recuse the entire district attorney's office from his second penalty-phase proceeding.

First, Smith argues that the district attorney's hiring of Burgess imputed a conflict of interest on the entire district attorney's office. Smith is incorrect.

> "In Alabama, there is not a per se rule that a district attorney's office must recuse itself when one assistant attorney has previously represented a defendant. See Smith v. State, 639 So. 2d 543 (Ala. Crim. App. 1993); Terry v. State, 424 So. 2d 710 (Ala. Crim. App. 1982); Hannon v. State, 48 Ala. App. 613, 266 So. 2d 825 (Ala. Crim. App. 1972). In Smith, we stated:
>
> > "'[Defense counsel] did not breach the attorney-client relationship because he abstained

from any participation in the prosecution of the appellant and he revealed no confidential information regarding his former client to anyone at the district attorney's office.'

"639 So. 2d at 548. In <u>Hannon</u>, we stated:

"'The public interest demanded that the prosecution go forward. There has been no breach of the attorney-client relationship, the privilege against disclosure has been preserved, and professional ethics, painstakingly observed, and the constitutional guarantee of a fair and impartial trial was not infringed.'

"48 Ala. App. at 618, 266 So. 2d at 829."

<u>Sneed v. State</u>, 1 So. 3d 104, 122 (Ala. Crim. App. 2007).

In his motion to recuse and at the hearing on his motion, Smith never alleged that Burgess had breached the attorney-client relationship by disclosing any information to the district attorney's office. At best, Smith made speculative assertions that his former trial counsel <u>might</u> have made such disclosures after he was hired by the district attorney. But the district attorney explained the safeguards in place in the district attorney's office to ensure that Burgess did not make such a disclosure. Because Smith failed to even allege that his former trial counsel breached the attorney-client relationship, the trial court did not err when it denied

40

Smith's motion to recuse the entire district attorney's office on an imputed conflict of interest.

Second, Smith, citing <u>Cuyler v. Sullivan</u>, 446 U.S. 335, 100 S. Ct. 1708, 64 L. Ed. 2d 333 (1980), argues that, "[i]n denying [his] motion to disqualify the district attorney's office, the trial court failed to conduct any meaningful inquiry into whether and what information had been disseminated from Mr. Burgess to others in the district attorney's office." (Smith's brief, p. 33.) <u>Cuyler</u>, however, does not support Smith's argument in this case.

"In <u>Cuyler</u>, the United States Supreme Court stated:

> "'<u>Holloway [v. Arkansas</u>, 435 U.S. 475 (1978)] requires state trial courts to investigate timely objections to multiple representation. But nothing in our precedents suggests that the Sixth Amendment requires state courts themselves to initiate inquiries into the propriety of multiple representation in every case. Defense counsel have an ethical obligation to avoid conflicting representations and to advise the court promptly when a conflict of interest arises during the course of trial. Absent special circumstances, therefore, trial courts may assume either that multiple representation entails no conflict or that the lawyer and his clients knowingly accept such risk of conflict as may exist. Indeed, as the Court noted in <u>Holloway</u>, <u>supra</u>, at 485-486, trial courts necessarily rely in large measure upon the good faith and good judgment of defense counsel. "An

41

'attorney representing two defendants in a criminal matter is in the best position professionally and ethically to determine when a conflict of interest exists or will probably develop in the course of a trial.'" 435 U.S., at 485, quoting State v. Davis, 110 Ariz. 29, 31, 514 P.2d 1025, 1027 (1973). Unless the trial court knows or reasonably should know that a particular conflict exists, the court need not initiate an inquiry.'

"446 U.S. at 346-47, 100 S. Ct. at 1717 (footnotes omitted). See also Hannon v. State, 48 Ala. App. 613, 620, 266 So. 2d 825, 831 (1972) ('"Nor is there basis for recusation in the charge that there is a possibility that Mr. Ware has violated the confidential relationship existing between attorney and client. Indeed, it is to be presumed that he, as a member of the bar in good standing, has and will respect the defendant's confidence."')."

Sneed v. State, 1 So. 3d 104, 122 (Ala. Crim. App. 2007).

Again, neither in his motion to recuse nor at the hearing on his motion to recuse did Smith ever allege that Burgess engaged in any improper conduct. Rather, Smith merely made speculative assertions about the possibility that Burgess could have disclosed confidential information. Because Smith never alleged that Burgess engaged in any improper behavior, the presumption is that Burgess did not engage in such conduct; thus, the trial court was free to presume that no such improper behavior occurred and had no obligation to conduct any further inquiry. In addition, the trial court could rely upon the assertions of the

42

Calhoun County District Attorney that Smith's former counsel was "screened" from the case from the "moment he was hired" so that he did not reveal any confidential information that he learned through his representation of Smith.

Accordingly, Smith is due no relief on this claim.

V.

Smith, relying primarily on Ramos v. Louisiana, 590 U.S. ___, 140 S. Ct. 1390, 206 L. Ed. 2d 583 (2020), argues that his "death sentence violates the Alabama and United States Constitutions because the jury did not return a unanimous verdict in favor of death." (Smith's brief, p. 35.) According to Smith, because his "jury did not return a[ ] unanimous verdict in favor of the death penalty, his death sentence must be reversed." (Smith's brief, p. 36.) Smith's argument has no merit.

We have held that

"'"Alabama law does not require that the jury's advisory verdict be unanimous before it can recommend death,"' Thompson, 153 So. 3d at 179 (quoting Miller v. State, 913 So. 2d 1148, 1169 n.4 (Ala. Crim. App. 2004)), and Keaton cites no case from the United States Supreme Court that requires such unanimity. See State v. Poole, 297 So. 3d 487, 504 (Fla. 2020), cert. denied 592 U.S. ___, 141 S. Ct. 1051, 208 L. Ed. 2d 521 (2021) (holding that the 'requirement of a unanimous jury' for the imposition of the death penalty 'finds no support in' caselaw from the United States Supreme Court). See also

43

Lane, 327 So. 3d at 776-77 (noting that '"both this Court and the Alabama Supreme Court have upheld death sentences imposed after the jury made a less-than-unanimous recommendation that the defendant be sentenced to death"' (quoting Brownfield v. State, 44 So. 3d 1, 39 (Ala. Crim. App. 2007))). Keaton's reliance on Ramos v. Louisiana, 590 U.S. ___, 140 S. Ct. 1390, 206 L. Ed. 2d 583 (2020), is misplaced because Ramos held only that the United States Constitution requires a unanimous verdict to support a conviction, not a sentence. See Ruiz v. Davis, 819 F. App'x 238, 246 n.9 (5th Cir. 2020) (noting that the United States Supreme Court held in Ramos that '"the Sixth Amendment's right to a jury trial requires a unanimous verdict to support a conviction," not a sentence' (quoting Ramos, 590 U.S. at ____, 140 S. Ct. at 1397))."

Keaton v. State, 375 So. 3d 44, 136-37 (Ala. Crim. App. 2021). Because there is no requirement that a jury unanimously agree to impose a death sentence, Smith's argument that his death sentence is unconstitutional because the jury "did not return a unanimous verdict in favor of death" (Smith's brief, p. 35) is without merit.

Accordingly, Smith is due no relief on this claim.

## VI.

Smith also argues that the trial court erred when it failed "to adequately address improper juror conduct and shield the jury from extraneous and/or prejudicial information." (Smith's brief, p. 44.) According to Smith,

44

"[d]uring a break on the second day of [his] sentencing hearing, juror [J.B.] informed the trial court that he had previously-undisclosed connections to Cynthia Warf and Jessica Foster -- two key State witnesses at the guilty phase, whose conduct was the subject of testimony by the State's investigator. (R. 560-61.) Although [J.B.] was removed from the jury, the trial court took no steps to ascertain the extent of [J.B.'s] extraneous knowledge of the crime and its participants, or whether he shared such knowledge with any other remaining members of the jury."[4]

(Smith's brief, pp. 44-45.) Smith's argument, which was not first raised in the trial court, is reviewed for plain error. See Rule 45A, Ala. R. App. P. We find no plain error.

## VII.

Smith argues that the trial court erred when it allowed the State to reintroduce into evidence Dr. Emily Ward's testimony from Smith's guilt-phase proceeding by reading the transcript of her testimony to the second

---

[4]Neither the State nor Smith revealed either Warf's or Foster's names to the venire during voir dire. When testimony during the second penalty phase revealed those names to the seated jury, Juror J.B. (who was an alternate juror) immediately disclosed to the court that he was familiar with both Warf and Foster. Juror J.B. explained that he has not "had contact with [Warf and her husband] in over 10 years, but I know them. And on top of that, if it's who I think it is, Jessica Foster has been a client at the rehab where my wife is a program manager." (R. 563-64.) Juror J.B. made clear that he "just figured all that out today" and he "just didn't make the connection." (R. 564.) Neither Smith nor the State made any arguments about Juror J.B.'s disclosure.

penalty-phase jury because, he says, it "undermined [his] rights under the Confrontation Clause of the Sixth Amendment of the United States Constitution." (Smith's brief, pp. 46-47.) Smith did not object to the State's reading of Dr. Ward's trial testimony to the jury during the second penalty-phase proceeding, nor did he expressly raise a Confrontation Clause argument in the trial court. Therefore, Smith's argument on appeal is reviewed for plain error. We find no error, plain or otherwise, with the trial court's allowing the State to read Dr. Ward's guilt-phase testimony to the jury during the second penalty phase of Smith's trial.

Indeed, this Court has

"'express[ed] doubt that the Confrontation Clause applies at sentencing, even in capital cases,' Lockhart, 163 So. 3d at 1133, and some federal appellate courts have unequivocally concluded that a defendant's right to confrontation does not apply at the penalty phase of a capital trial. See, e.g., Muhammad v. Secretary, Florida Dep't of Corr., 733 F.3d 1065, 1074 (11th Cir. 2013) (holding that the United States Supreme Court's decisions in Williams v. New York, 337 U.S. 241, 69 S. Ct. 1079, 93 L. Ed. 1337 (1949), and Gardner v. Florida, 430 U.S. 349, 97 S. Ct. 1197, 51 L. Ed. 2d 393 (1977), 'together stand for the proposition that a defendant does not have a right to confront hearsay declarants at a capital sentencing hearing'); and Szabo v. Walls, 313 F.3d 392, 398 (7th Cir. 2002) ('[T]he Supreme Court has held that the Confrontation Clause does not apply to capital sentencing. It applies through the finding of guilt, but not to sentencing, even when that sentence is the death penalty.' (citing Williams v. New York, supra))."

46

<u>Keaton v. State</u>, 375 So. 3d at 115-16.  To prevail on his plain-error argument, Smith must "establish an obvious, indisputable, and egregious error that adversely affected the outcome of his sentencing."  <u>Petric v. State</u>, 157 So. 3d 176 (Ala. Crim. App. 2013).  Because it is far from "obvious" and "indisputable" that the Confrontation Clause applies to a penalty-phase proceeding, we certainly cannot hold that the trial court's allowing the State to reintroduce Dr. Ward's guilt-phase testimony during Smith's second penalty-phase proceeding was plain error.

In any event, Smith's argument is meritless because Dr. Ward's guilt-phase testimony, which was subject to cross-examination by Smith's counsel during the guilt phase of his trial, was admissible during the penalty phase of Smith's trial pursuant to § 13A-15-45(c), Ala. Code 1975, which provides:

> "At the sentence hearing evidence may be presented as to any matter that the court deems relevant to sentence and shall include any matters relating to the aggravating and mitigating circumstances referred to in Sections 13A-5-49, 13A-5-51, and 13A-5-52.  Evidence presented at the trial of the case may be considered insofar as it is relevant to the aggravating and mitigating circumstances without the necessity of re-introducing that evidence at the sentence hearing, unless the sentence hearing is conducted before a trial judge other than the one before whom the defendant was

47

tried or a jury other than the trial jury before which the defendant was tried."

Here, as Smith notes in his argument on appeal, Dr. Ward's testimony that was read into the record during Smith's second penalty-phase proceeding was the testimony that she gave to the jury during Smith's guilt-phase proceeding. As set out above, Dr. Ward's testimony addressed the extent of Thompson's injuries and the manner in which he died. Dr. Ward's testimony also established that Thompson would not have died quickly, that he would have been aware of his injuries, and that he would have experienced significant pain. Because Dr. Ward's testimony was a part of the State's evidence at Smith's guilt-phase proceeding, because it was relevant to the aggravating circumstance that the capital offense was especially heinous, atrocious, or cruel when compared to other capital offenses, and because the State had to reintroduce Dr. Ward's testimony to the new penalty-phase jury for it to consider the testimony, the trial court properly admitted Dr. Ward's guilt-phase testimony pursuant to § 13A-5-45(c), Ala. Code 1975.

Accordingly, the trial court did not commit any error, plain or otherwise, when it admitted Dr. Ward's testimony during Smith's second penalty-phase proceeding.

VIII.

Smith next argues that "the use of a conviction for [his] juvenile conduct as an aggravating factor making him eligible to receive the death penalty violated [his] right to be free from cruel and unusual punishment under the Eighth Amendment." (Smith's brief, p. 51.) According to Smith, "the prosecution presented evidence regarding [his] prior conviction for robbery in the first degree when he was sixteen, and the jury determined that [his] prior conviction was an aggravating factor supporting the imposition of a death sentence." (Smith's brief, p. 51.) Smith, citing Roper v. Simmons, 543 U.S. 551 (2005), argues that, "though Roper does not require that courts 'wipe clean' individuals' records, ... it does insist that individuals not be executed for conduct they engaged in as children." (Smith's brief, pp. 51-52.) But Smith's "juvenile conduct" -- as he calls it -- resulted in an "adult" criminal conviction for first-degree robbery. The record on appeal shows that Smith committed the first-degree robbery about two months before he turned 17 years old and that he was tried and convicted as an adult offender in Calhoun Circuit Court. (C. 1010-11.)

In <u>Jackson v. State</u>, 305 So. 3d 440, 496 (Ala. Crim. App. 2019), this Court rejected an argument identical to the one Smith raises here. In <u>Jackson</u>, this Court held that "[n]othing in <u>Roper</u> forbids using the prior adult conviction that occurred when Jackson was a juvenile as an aggravating circumstance to support the death penalty, and <u>Roper</u> does not bar Jackson's sentence of death." So, just as in <u>Jackson</u>, nothing prohibits the use of Smith's prior adult conviction for first-degree robbery as an aggravating circumstance to support his death sentence.

Accordingly, Smith is not entitled to any relief on this claim.

## IX.

Smith argues that "double-counting murder during the commission of a robbery and murder during the commission of a kidnapping at the guilt and penalty phases violated state and federal law." (Smith's brief, p. 53.) Yet this Court and the Alabama Supreme Court have consistently rejected this argument and recognized that there is no constitutional or statutory prohibition on "'double counting' circumstances both as an element of the offense and as an aggravating circumstance." <u>Hicks v. State</u>, 378 So. 3d 1071, 1127 (Ala. Crim. App. 2019). Accordingly, Smith is not entitled to any relief on this claim.

X.

Smith next argues that "Alabama's method of execution [by lethal injection] constitutes cruel and unusual punishment in violation of the Eighth Amendment." (Smith's brief, p. 55.) Smith's argument was not first presented in the trial court. Smith did argue generally at the close of the State's penalty-phase case that "the death penalty is cruel and unusual punishment." (R. 576.) Smith, however, did not raise the specific argument that the method by which Alabama carries out the death penalty is cruel and unusual punishment. Thus, his argument is due to be reviewed for plain error only. But regardless of whether the specific argument was raised below, we find no error, plain or otherwise, because Smith's argument is without merit. Indeed, the Alabama Supreme Court has held that lethal injection does not constitute cruel and unusual punishment. See Ex parte Belisle, 11 So. 3d 323, 349 (Ala. 2008) (holding "that Alabama's use of lethal injection as a method of execution does not violate the Eighth Amendment to the United States

Constitution").[5]  Accordingly, Smith is not entitled to any relief on this claim.

XI.

Finally, pursuant to § 13A-5-53, Ala. Code 1975, this Court is required to address the propriety of Smith's capital-murder conviction and death sentence.

As set out above, Smith was convicted of two counts of capital murder -- one count for intentionally killing Thompson during a kidnapping, a violation of § 13A-5-40(a)(1), Ala. Code 1975, and one count for intentionally killing Thompson during a robbery, a violation of § 13A-

---

[5]Although Smith's argument on appeal attacks the constitutionality of lethal injection as a method of execution, Smith's argument fails to recognize that Alabama has other available methods of execution, having recently adopted nitrogen hypoxia as a method of execution.  This Court has explained that, even "if lethal injection is held unconstitutional by the United States Supreme Court or by the Alabama Supreme Court, 'all persons sentenced to death for a capital crime shall be executed by any constitutional method of execution.'"  Saunders v. State, 10 So. 3d 53, 112 (Ala. Crim. App. 2007) (quoting § 15-18-82.1(c), Ala. Code 1975).  In other words, even if this Court agreed with Smith's argument (and we do not), he would not be entitled to a reversal of his death sentence because the State could carry out his execution via nitrogen hypoxia.  See § 15-18-82.1(h), Ala. Code 1975 ("In any case in which an execution method is declared unconstitutional, the death sentence shall remain in force until the sentence can be lawfully executed by any valid method of execution.").

5-40(a)(2), Ala. Code 1975. The jury's guilty verdicts established the existence of two aggravating circumstances -- namely, that the capital murder was committed during a first-degree kidnapping and that the capital murder was committed during a first-degree robbery. See § 13A-5-49(4), Ala. Code 1975. At the conclusion of his second penalty-phase proceeding, the jury found three additional aggravating circumstances to exist beyond a reasonable doubt -- namely, that Smith committed the capital offenses after having been previously convicted of a felony involving the use or threat of violence to a person, that Smith committed the capital offenses while under a sentence of imprisonment, and that the capital offense was especially heinous, atrocious, or cruel. (C. 222-24.) Thus, five aggravating circumstances were found to exist beyond a reasonable doubt. The jury then recommended by a vote of 10 to 2 that Smith be sentenced to death. (C. 225.) After conducting a judicial-sentencing hearing, the trial court followed the jury's recommendation and sentenced Smith to death.

After examining the record on appeal, this Court finds nothing to show that Smith's death sentence was imposed as the result of the

influence of passion, prejudice, or any other arbitrary factor. See § 13A-5-53(b)(1), Ala. Code 1975.

Additionally, § 13A-5-53(b)(2), Ala. Code 1975, requires this Court to reweigh the aggravating and mitigating circumstances to determine whether Smith's sentence of death is appropriate. In so doing, we are mindful of the following:

> "'Section 13A-5-48, Ala. Code 1975, provides:
>
> > "'"The process described in Sections 13A-5-46(e)(2), 13A-5-46(e)(3) and Section 13A-5-47(e) of weighing the aggravating and mitigating circumstances to determine the sentence shall not be defined to mean a mere tallying of aggravating and mitigating circumstances for the purpose of numerical comparison. Instead, it shall be defined to mean a process by which circumstances relevant to sentence are marshalled and considered in an organized fashion for the purpose of determining whether the proper sentence in view of all the relevant circumstances in an individual case is life imprisonment without parole or death."
>
> > "'"The determination of whether the aggravating circumstances outweigh the mitigating circumstances is not a numerical one, but instead involves the gravity of the aggravation as compared to the mitigation." Ex parte Clisby, 456 So. 2d 105, 108-09 (Ala. 1984). "[W]hile the existence of an aggravating or mitigating circumstance is a fact susceptible to proof, the relative weight of each is not; the process of weighing, unlike facts, is not susceptible to proof by either party." Lawhorn v. State, 581 So. 2d 1159, 1171 (Ala. Crim. App. 1990). ... "The weight to be attached to the

aggravating and the mitigating evidence is strictly within the discretion of the sentencing authority." Smith v. State, 908 So. 2d 273, 298 (Ala. Crim. App. 2000).'"

Collins v. State, 361 So. 3d 1, 63 (Ala. Crim. App. 2019) (opinion on return to second remand) (quoting Stanley v. State, 143 So. 3d 230, 333 (Ala. Crim. App. 2011) (opinion on remand from the Alabama Supreme Court)).

Here, the trial court, in its sentencing order, found the existence of the five aggravating circumstances found by the jury -- "two aggravating factors that carried over from the guilt phase, Murder during a Kidnapping in the First Degree and Murder during a Robbery in the First Degree" and the three aggravating circumstances the jury found to exist beyond a reasonable doubt. (C. 237.) The trial court also "consider[ed] all of these mitigating circumstances":

> "The defense offered testimony and evidence that the following statutory mitigators were applicable: (1) The capital offense was committed while the defendant was under the influence of extreme mental or emotional disturbance pursuant to Section 13A-5-51(2); (2) The Defendant acted under extreme duress or under the substantial domination of another person pursuant to Section 13A-5-51(5); and (3) The Defendant did not have the capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired.

"The defense further offered evidence and testimony under Section 13A-5-52. This evidence and testimony consisted of multiple reports of the horrendous upbringing that the defendant endured. Testimony from his mother and brother consisted of the physical, mental, emotional, and sexual abuse that was persistent throughout Mr. Smith's life. Testimony of Elaine Young, Children's Advocacy Center Director, discussed the nature of his abuse and the failure of the system to adequately protect Mr. Smith as a child.

"All of the mitigating evidence was summarized by JoAnn Terrell. Ms. Terrell is an expert in the field of Mitigation and provided compelling testimony about the mitigating circumstances present in this case."

(C. 237-38.) The trial court then sentenced Smith to death, concluding:

"After considering the evidence presented, the arguments of counsel, the report prepared by Pardons and Paroles, the jury's verdict, and after weighing the aggravating circumstances against the mitigating circumstances, this Court finds that the aggravating circumstances outweigh the mitigating circumstances.

"This Court has sworn to uphold the law of this State, and this is a duty that it does not take lightly. It is never easy to recommend the taking of the life of another person; however, the law requires it in this case."

(C. 238.)

The trial court's findings are correct, and this Court, after independently weighing the aggravating circumstances found to exist and all the mitigating circumstances found to exist, holds that Smith's sentence of death is appropriate.

Next, as required by § 13A-5-53(b)(3), Ala. Code 1975, this Court must determine whether Smith's sentence is excessive or disproportionate when compared to the penalty imposed in similar cases. It is not. Again, Smith was convicted of intentionally killing Thompson during a kidnapping, a violation of § 13A-5-40(a)(1), Ala. Code 1975, and for intentionally killing Thompson during a robbery, a violation of § 13A-5-40(a)(2), Ala. Code 1975. As noted above, five aggravating circumstances were proved to exist beyond a reasonable doubt -- namely, that the capital murder was committed during a first-degree kidnapping; that the capital murder was committed during a first-degree robbery; that Smith committed the capital offenses after having been previously convicted of a felony involving the use or threat of violence to a person; that Smith committed the capital offenses while under a sentence of imprisonment; and that the capital offense was especially heinous, atrocious, or cruel. (C. 222-24.) Sentences of death have been imposed for similar crimes in Alabama. See Gaddy v. State, 698 So. 2d 1100, 1150 (Ala. Crim. App. 1995) ("Two-thirds of all death cases in Alabama involve murders that occur during the course of a robbery."). See also Shanklin v. State, 187 So. 3d 734 (Ala. Crim. App. 2014) (robbery and burglary);

Mills v. State, 62 So. 3d 553 (Ala. Crim. App. 2008) (robbery); Sale v. State, 8 So. 3d 330 (Ala. Crim. App. 2008) (kidnapping); Lewis v. State, 24 So. 3d 480 (Ala. Crim. App. 2006) (kidnapping); and Wilson v. State, 142 So. 3d 732 (Ala. Crim. App. 2010) (especially-heinous-atrocious-or-cruel capital murder committed during a robbery and burglary). Therefore, this Court holds that Smith's death sentence is neither excessive nor disproportionate when compared to the penalty imposed in similar cases.

Lastly, this Court has searched the record for any error that may have adversely affected Smith's substantial rights and has found none. See Rule 45A, Ala. R. App. P.

Conclusion

Based on these reasons, Smith's death sentence is affirmed.

AFFIRMED.

Windom, P.J., and Kellum, McCool, and Minor, JJ., concur.